Patrick J. BUCHANAN
et al., Plaintiffs,

v.

FEDERAL ELECTION COMMISSION,
Defendant.

No. Civ.A. 00–1775(RWR).

United States District Court,
District of Columbia.

Sept. 14, 2000.

Dale Andrew Cooter, Cooter, Mangold, Tompert, Wayson, P.L.L.C., Washington, DC, for plaintiffs Reform Party, Pat Choate.

John J. Duffy, Cynthia L. Taub, Steptoe & Johnson, L.L.P., Washington, DC, for plaintiffs Patrick Buchanan, Angela Buchanan, Buchanan Reform.

Lawrence Mark Noble, Richard B. Bader, Stephen E. Hershkowitz, Erin K. Monaghan, Federal Election Commission, Washington, D.C., for defendants.

## MEMORANDUM OPINION

ROBERTS, District Judge.

Plaintiffs bring this action challenging the decision of the Federal Election Commission ("FEC") to dismiss plaintiffs' administrative complaint which alleged that the Commission on Presidential Debates ("CPD") is violating FEC regulations governing debate-staging organizations. The parties have cross-moved for summary judgment. The FEC contends (1) that plaintiffs lack standing to bring this suit, and (2) even if plaintiffs do have standing, the FEC's dismissal of their complaint was not contrary to law. Plaintiffs counter that the FEC's dismissal has caused them concrete injuries which this Court can redress, and that the dismissal was contrary to law. Because I find that the plaintiffs have standing to bring their claims, but that those claims fail on the merits, defendant's motion for summary judgment will be granted and plaintiffs' motion for summary judgment will be denied.

1. The four are Buchanan's campaign committee, the Reform Party, a political supporter and registered voter, and another registered voter.

2. FECA defines a contribution as "any gift, subscription, loan, advance, or deposit of money or anything of value made by a person for the purpose of influencing any election for Federal office." 2 U.S.C. § 431(8)(A)(i). An expenditure is in turn defined as "any purchase, payment, distribution, loan, advance, deposit, or gift of money or anything of value

### BACKGROUND

Patrick J. Buchanan is running for President on the ticket of the Reform Party of the United States of America (the "Reform Party"). He hopes to be a participant in the upcoming presidential debates being sponsored by the Committee on Presidential Debates ("CPD"). However, as things now stand, Buchanan will not be eligible to participate because he is unlikely to meet the CPD's criteria for participation which require, among other things, that the candidate have the support of at least 15% of the electorate as measured by the average of five national polls on a certain date. Buchanan and four other plaintiffs [1] therefore filed a complaint with the FEC alleging that the CPD was in violation of FEC regulations which require, in relevant part, that debate-staging organizations be nonpartisan groups using "pre-established objective criteria" to select debate participants. 11 C.F.R. § 110.13(c). The FEC subsequently dismissed the complaint, finding that there was "no reason to believe" that the CPD was violating the law. Plaintiffs now seek judicial review of the FEC's dismissal, arguing that it must be overturned as arbitrary and capricious and contrary to law.

### I.  Statutory and Regulatory Framework

The Federal Election Campaign Act of 1971 ("FECA"), 2 U.S.C. § 431 et seq. (1994), generally prohibits corporations and labor unions from making "contributions" or "expenditures" [2] in connection with federal elections. See 2 U.S.C. § 441b(a). Political committees [3] may accept contributions or make expenditures in connection with federal elections, but must first register with the FEC, and then report contributions, receipts and disburse-

made by any person for the purpose of influencing any election for Federal office." Id. at § 431(9)(A)(i).

3. "Political committees" include "any committee, club, association, or other group of persons which receives contributions aggregating in excess of $1,000 during a calendar year or which makes expenditures aggregating in excess of $1,000 during a calendar year." 2 U.S.C. § 431(4).

ments in accordance with the FECA and the FEC's implementing regulations. *See id.* at §§ 433–34; 11 C.F.R. § 102.1(d) (1999).

The FECA contains a "safe harbor" provision which makes exceptions to the Act's restrictions on contributions and expenditures. For instance, an "expenditure" does not include "nonpartisan activity designed to encourage individuals to vote or register to vote." 2 U.S.C. § 431(9)(B)(ii). FEC regulations that became effective in 1996 construe the safe harbor provision as excluding from the definitions of "contribution" and "expenditure" certain funds raised or spent for the purpose of staging presidential debates. *See* 11 C.F.R. §§ 100.7(b)(21), 100.8(b)(23). However, this exception applies only if the following two conditions are met: (1) the debate sponsoring organization must be a nonprofit organization that does not "endorse, support, or oppose political candidates or political parties"; and (2) the debates themselves must meet certain requirements set forth in section 110.13 of the FEC's regulations. *Id.* at §§ 110.13(a)(1), 114.4(f). One of Section 110.13's requirements mandates that debate staging organizations use "pre-established objective criteria" to determine which candidates will be eligible to participate in the debate. *Id.* at § 110.13(c).[4] In sum, the FEC regulations at issue allow non-profit organizations to accept contributions and make expenditures to stage a presidential debate so long as the staging entity is nonpartisan and employs objective criteria to choose the participants.

## II. *The CPD's Debate Criteria*

The CPD is a private, non-profit corporation formed by the two major parties in 1987 for the purpose of sponsoring presidential debates. It has staged presidential debates leading up to the 1988, 1992, and 1996 elections.

In January of 2000, the CPD announced that it would sponsor three presidential debates and one vice-presidential debate in October of 2000 in anticipation of the 2000 presidential election. (Pls.' Admin.Compl.Ex. 1, Administrative Record ("AR") Tab 1.) The CPD listed the following three criteria it would use to select the debates' participants: (1) evidence of Constitutional eligibility to become President; (2) evidence of ballot access which indicated that the candidate had qualified to have his or her name appear on enough state ballots to have a mathematical possibility of winning a majority of the Electoral College; and (3) evidence of electoral support which required "a level of support of at least 15% (fifteen percent) of the national electorate as determined by five selected national public opinion polling organizations, using the average of those organizations' most recent publicly reported results at the time of the determination." (*Id.* at 2.)[5] Only the third criterion is at issue here.

## III. *Plaintiffs' Administrative Complaint*

On March 20, 2000, plaintiffs filed their administrative complaint (designated MUR 4987) with the FEC pursuant to section 437g(a)(1) of the FECA which provides that "any person who believes a violation of this Act … has occurred, may file a complaint with the [FEC]." In their complaint, plaintiffs alleged that the CPD could not qualify as a debate-staging orga-

---

4. Debates must also "include at least two candidates[,]" and the sponsor may not "structure the debates to promote or advance one candidate over another." 11 C.F.R. § 110.13(b). In addition, the staging organization "shall not use nomination by a particular political party as the sole objective criterion to determine whether to include a candidate in a debate." *Id.* at § 110.13(c).

5. The five polling organizations are: ABC News/*Washington Post;* CBS News/*New York Times;* NBC News/*Wall Street Journal;* CNN/ *USA Today* /Gallup; and Fox News/Opinion Dynamics.

nization because (1) the CPD is not a nonpartisan organization, but rather a bipartisan organization supporting the Democratic and Republican parties while opposing third parties such as the Reform Party, and (2) the CPD's 15% threshold of voter support as measured by averaging five national polls is not an "objective" criterion, but rather a subjective criterion designed to eliminate third parties from the debates. Plaintiffs therefore claimed that the CPD's proposed debates do not qualify under the FECA's safe harbor and, as a consequence, funds raised or spent in connection with those debates would constitute illegal contributions and expenditures in violation of 2 U.S.C. § 441b(a).

### IV. *The FEC's Dismissal of Plaintiffs' Administrative Complaint*

When a complaint is filed with the FEC, a three-step process is triggered. First, the FEC reviews the complaint and any response to it and then votes on whether there is "reason to believe" that a FECA violation occurred. 2 U.S.C. § 437g(a)(2). If four members of the FEC vote that there is "reason to believe" that a violation occurred, then the FEC must conduct an investigation. *Id.* After the investigation is completed, the FEC then takes a second vote to determine whether there is "probable cause" to believe that a violation has occurred. *See id.* at § 437g(a)(4)(A)(i). If four members of the FEC vote in the affirmative, the FEC must attempt to reach a conciliation agreement with the alleged violator. *See id.* If conciliation fails, the FEC then takes a third vote to determine whether the FEC will institute a civil action. *See id.* at § 437g(a)(6)(A). If at any point in this process four FEC members do not affirmatively vote to proceed to the next stage, the FEC will dismiss the complaint. The complainant may then file a petition for review of that dismissal in this Court. *See id.* at § 437g(a)(8)(A).

On July 19, 2000, the FEC dismissed the plaintiffs' administrative complaint at the first stage, finding that there was "no reason to believe" that a violation of FECA had occurred. The justification for the dismissal is contained in a report issued by the FEC's General Counsel. (AR Tab 14.) The General Counsel's report found that (1) there was no evidence suggesting that the CPD was either "controlled by" the two major political parties or that they influenced the CPD's 2000 debate criteria, and (2) the CPD's criteria were objective, noting that FEC had upheld less objective criteria in the past. (*Id.* at 15–19.) Thus, the FEC voted to dismiss the plaintiffs' complaint without conducting any further investigation.

Plaintiffs now seek judicial review of that dismissal on the ground that the agency's decision was arbitrary, capricious, and contrary to law. They allege, as they did in the administrative complaint, that the CPD does not qualify for safe harbor protection because the CPD is bipartisan, not nonpartisan, and its selection criteria are not objective. Therefore, plaintiffs claim that the CPD will be in violation of 2 U.S.C. § 441b(a) by making illegal corporate contributions to the Bush/Cheney and Gore/Lieberman campaigns. Plaintiffs also assert "informational injuries" based on the CPD's failure to register as a "political committee" and to report its contributions and expenditures.

### DISCUSSION

### I. *Standing*

■ The FEC contends that this action should be dismissed at the outset because plaintiffs do not have constitutional standing to bring their claims. To satisfy Article III's standing requirements, plaintiffs bear the burden of establishing: (1) an "injury in fact" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical"; (2) a causal connection between the alleged injury and conduct that is "fairly traceable" to the defendant; and (3) that it is "likely," and not merely "speculative," that the injury

will be "redressed by a favorable decision." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (internal quotations and citations omitted). On a motion for summary judgment, that burden can be met by submitting affidavits or other evidence of specific facts which, for the purpose of the motion, will be taken as true. *See id.* at 561, 112 S.Ct. 2130.

The FEC contends that both of the plaintiffs' standing theories fail. Specifically, it argues first that plaintiffs' have failed to allege a legally sufficient injury, and second, that any potentially cognizable injury cannot be fairly traced to the FEC nor redressed by this Court because any such injury was caused by the independent action of the CPD. I disagree with the FEC on both scores.

### A. *Injury In Fact*

To have standing, plaintiffs' suit must be based on "an injury stemming from the FEC's dismissal of [their] administrative complaint." *Judicial Watch, Inc. v. FEC,* 180 F.3d 277, 277 (D.C.Cir.1999) *(per curiam ).* Plaintiffs claim that the dismissal of their complaint has caused them both a "competitive" and an "informational" injury. First, plaintiffs contend that they will be injured if Buchanan is excluded from the debates because they will be denied a crucial platform for expressing their ideas, Buchanan's chances of winning the election will be reduced, and, in turn, the Reform Party's chances of qualifying for federal funding for the 2004 elections will be diminished. Conversely, the two major parties would be at a competitive advantage in the election if Buchanan is not allowed to debate. Plaintiffs also claim that they will suffer an informational injury caused by the CPD's failure to register as a political committee and report its contributions and expenditures.

#### a. *Competitive Injury*

■ The doctrine of "competitor standing" had been "recognized in circum-

stances where a defendant's actions benefitted a plaintiff's competitors, and thereby caused the plaintiff's subsequent disadvantage." *Fulani v. Brady,* 935 F.2d 1324, 1327 (D.C.Cir.1991) (citing cases), *cert. denied,* 502 U.S. 1048, 112 S.Ct. 912, 116 L.Ed.2d 812 (1992). Thus, it is well-settled that an economic actor may challenge the government's bestowal of an economic benefit on a competitor. *See, e.g., Northeastern Florida Chapter of Associated Gen. Contractors of Am. v. Jacksonville,* 508 U.S. 656, 666, 113 S.Ct. 2297, 124 L.Ed.2d 586 (1993) (holding that general contractors had standing to challenge city ordinance giving preferential treatment in the award of city contracts to minority-owned businesses); *Clarke v. Securities Indus. Ass'n,* 479 U.S. 388, 403, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987) (holding that securities brokers had standing to challenge ruling that national banks could act as discount brokers); *Investment Co. Inst. v. Camp,* 401 U.S. 617, 620, 91 S.Ct. 1091, 28 L.Ed.2d 367 (1971) (granting investment companies standing to challenge ruling that banks could deal in collective investment funds); *Association of Data Processing Serv. Orgs., Inc., v. Camp,* 397 U.S. 150, 152–53, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970) (finding that data processing company had standing to challenge rulings by Comptroller of the Currency allowing national banks to compete in data processing). Courts within this Circuit and elsewhere have expanded the competitor standing doctrine to the political arena, recognizing that political actors may bring suit when they are competitively disadvantaged by government action. *See, e.g., International Ass'n of Machinists and Aerospace Workers v. FEC,* 678 F.2d 1092, 1098 (D.C.Cir.1982) *(en banc )* (finding that the "relative diminution in [plaintiffs'] political voices—their influence in federal elections—" qualified as a sufficiently concrete and particularized injury for standing purposes); *Common Cause v. Bolger,* 512 F.Supp. 26, 32 (D.D.C.1980) (three-judge panel) (ruling that candidate had

standing to challenge incumbents' abuse of the franking privilege); *Schulz v. Williams*, 44 F.3d 48, 53, (2d Cir.1994) (holding that New York State Conservative Party candidate for governor had standing to challenge allegedly improper placement of the Libertarian Party candidate on the state-wide ballot); *Fulani v. Hogsett*, 917 F.2d 1028, 1030 (7th Cir.1990) (holding that New Alliance Party candidates had standing to challenge Indiana state electoral officials' untimely certification of Republican and Democratic presidential candidates to be on state ballot); *Owen v. Mulligan*, 640 F.2d 1130, 1133 (9th Cir.1981) (same as *Bolger*). However, the D.C. Circuit has "never completely resolved [the] thorny issue" of how far the doctrine of political competitor standing can be stretched. *Gottlieb v. FEC*, 143 F.3d 618, 620 (D.C.Cir.1998) (internal quotations omitted).

In attacking plaintiffs' claim of competitive injury, the FEC relies chiefly the D.C. Circuit's rulings in *Gottlieb* and *Fulani v. Brady*. In the latter case, Dr. Lenora Fulani, a minor party presidential candidate in the 1988 election, sued the Internal Revenue Service challenging the CPD's tax-exempt status on the ground that the CPD's tax-exempt status contributed to her exclusion from the 1988 presidential debates. The D.C. Circuit rejected Fulani's contention that she had "competitor standing" because Fulani was not eligible to receive tax-exempt status herself. *See Fulani v. Brady*, 935 F.2d at 1328. Fulani might have had a chance "if the IRS were depriving [her] of a benefit that it afforded to others similarly placed...." *Id.* However, that was not the case. *See also Fulani v. Bentsen*, 35 F.3d 49 (2d Cir.1994) (holding that Fulani lacked standing to challenge a debate sponsor's tax-exempt status which she alleged contributed to her competitive disadvantage in the election).

In *Gottlieb*, the D.C. Circuit relied on *Fulani v. Brady* to hold that the citizen-plaintiffs, who opposed then-Governor Bill Clinton in the 1992 presidential election, did not have competitor standing to challenge the FEC's dismissal of their claim that the Clinton campaign had mishandled federal matching funds. The panel reasoned that the plaintiffs were "never in a position to receive the matching funds.... Only another candidate could make such a claim." *Gottlieb*, 143 F.3d at 621.

The FEC assumes that the same logic must apply here because none of the plaintiffs are actually in competition with the CPD, whom the FEC characterizes as the actual recipient of the benefit of the FEC's allegedly erroneous dismissal of plaintiffs' administrative complaint. However, this argument misconstrues the nature of plaintiffs' claim and in turn the applicability of *Fulani v. Brady* and *Gottlieb*.

In *Fulani v. Brady*, the fact that the plaintiffs' did not sue under FECA, but rather under the Internal Revenue Code, proved dispositive. The Court of Appeals noted the judicial recognition of "the special problems attendant upon the establishment of standing in tax ... cases, when a litigant seeks to attack the tax exemption of a third party." *Fulani v. Brady*, 935 F.2d at 1327 (internal quotations and citation omitted). Moreover, the panel found that "the statutory scheme created by Congress is inconsistent with, if not preclusive of, third party litigation of tax-exempt status." *Id.* Thus, it asserted that "Fulani's claims would be addressed more appropriately under the FEC's regulation than through the Internal Revenue Code." *Id.* at 1329 (citation omitted).

In this case, plaintiffs have proceeded under the FEC's regulations. The FECA, unlike the Internal Revenue Code, confers a broad grant of standing. As the Supreme Court has recognized:

> Congress has specifically provided in FECA that "[a]ny person who believes a violation of this Act ... has occurred, may file a complaint with the Commission." § 437g(a)(1). It has added that "[a]ny party aggrieved by an order of the Commission dismissing a complaint filed by such party ... may file a peti-

tion" in district court seeking review of that dismissal. § 437g(a)(8)(A). History associates the word "aggrieved" with a congressional intent to cast the standing net broadly—beyond the common-law interest and substantive statutory rights upon which "prudential" standing traditionally rested.

*FEC v. Akins,* 524 U.S. 11, 19, 118 S.Ct. 1777, 141 L.Ed.2d 10 (1998) (citations omitted). Thus, FECA's statutory scheme was specifically designed to accommodate suits such as plaintiffs' which challenge the FEC's dismissal of an administrative complaint.

Of course, in the passage excerpted above, the Supreme Court was referring to the doctrine of "prudential" standing rather than constitutional standing.[6] FECA does not alter the constitutional requirement that the plaintiffs suffer an injury in fact. *See Common Cause v. FEC,* 108 F.3d 413, 419 (D.C.Cir.1997) *(per curiam)* (holding that "[s]ection 437g(a)(8)(A) does not confer standing; it confers a right to sue upon parties who otherwise already have standing.") However, plaintiffs will suffer such an injury—the loss of an opportunity to participate in the presidential debates which few would doubt can be instrumental to a candidate's success in the general election. The Second Circuit recognized this fundamental, and rather obvious, point in another case brought by Dr. Fulani:

In this era of modern telecommunications, who could doubt the powerful beneficial effect that mass media exposure can have today on the candidacy of a significant aspirant seeking national political office. The debates sponsored by the League were broadcast on na-

tional television, watched by millions of Americans, and widely covered by the media. It is beyond dispute that participation in these debates bestowed on the candidates who appeared in them some competitive advantage over their nonparticipating peers.... In our view, the loss of competitive advantage flowing from the League's exclusion of Fulani from the national debates constitutes sufficient "injury" for standing purposes, because such loss palpably impaired Fulani's ability to compete on an equal footing with other significant presidential candidates. To hold otherwise would tend to diminish the import of depriving a serious candidate for public office of the opportunity to compete equally for votes in an election, and would imply that such a candidate could never challenge the conduct of the offending agency or party.

*Fulani v. League of Women Voters Educ. Fund,* 882 F.2d 621, 626 (2d Cir.1989) (citations omitted).[7]

The end of this quoted excerpt is worth emphasizing. Precluding candidates from challenging the CPD's debate rules under the FECA would leave few others to do so. Perhaps other prospective debate sponsors might, but it is relatively self-evident that the people who have the most to gain and lose from the criteria governing the debate participation are the candidates themselves. When a debate sponsor uses subjective criteria for choosing the participants, the candidates are the ones who suffer a "concrete and particularized" injury that would imminently deprive them of a fair opportunity to compete on equal footing with their rivals. *Lujan,* 504 U.S.

6. The FEC does not challenge plaintiffs' prudential standing to bring this case because it is clear that candidates, political parties, and voters are within the "zone of interests" protected by FECA. *See Akins,* 524 U.S. at 20, 118 S.Ct. 1777.

7. It is true, as plaintiffs have properly conceded, that the D.C. Circuit in *Fulani v. Brady* criticized the Second Circuit's opinion in *Fu-*

*lani v. League of Women Voters.* However, that criticism was leveled chiefly at the Second Circuit's analysis of the causation and redressability prongs of the standing test, not the injury in fact prong. The D.C. Circuit, while not indicating any explicit agreement with the portion of the Second Circuit's opinion excerpted above, did not state any explicit disagreement either.

at 560, 112 S.Ct. 2130. The harm to other debate sponsors from the use of selective criteria is comparatively minute. Thus, if I were to accept the FEC's argument, the FEC's decisions regarding the legality of debate criteria would be rendered largely unreviewable despite the fact that minor party candidates such as Buchanan would likely suffer substantial harm to their electoral prospects. This cannot be.

*Gottlieb* is also inapposite. There, the plaintiffs claimed that the Clinton campaign had misused federal matching funds. The D.C. Circuit held, relying on *Fulani v. Brady,* that to assert competitor standing successfully, "the plaintiff [must] show that he personally competes in the same arena with the same party to whom the government has bestowed the assertedly illegal benefit." *Gottlieb,* 143 F.3d at 621 (internal quotations and citation omitted). The citizen-plaintiffs lacked standing because they were not themselves eligible to receive matching funds.

■ In this case, by contrast, plaintiffs can fairly claim to be in the same "arena" with the CPD. Although the CPD is a debate staging organization and not a candidate or political party, plaintiffs allege that the CPD is controlled by, and operates for the benefit of, the two major parties and their candidates. Assuming, based on the evidence they have submitted, the truth of plaintiffs' assertion that the CPD is nothing but an alter-ego for the Democratic and Republican parties, then the benefit being conferred upon the CPD as a debate-staging organization is being conferred upon the plaintiffs' direct competitors. If the FEC were to allow the debates to proceed using subjective criteria designed to eliminate third party competition, then the plaintiffs would plainly be "personally disadvantaged." *Id.* That injury would be direct, substantial, and certainly one that FECA and its implementing regulations seek to prevent. Accordingly, I find that the plaintiffs have satisfied the injury in fact element of

standing under the political competitor theory.

### b. *Informational Injury*

Aside from claiming that the CPD's debate criteria put them at a competitive disadvantage to the two major parties, plaintiffs also claim that they have suffered an "informational injury" based on their allegation that the CPD is a "political committee" required to register with the FEC and report its receipts and disbursements. Plaintiffs allege that the CPD's subsequent failure to register and report has deprived plaintiffs of information to which they are entitled under FECA.

Plaintiffs argue that this case is on all fours with *Akins.* The plaintiffs in *Akins* challenged the FEC's decision that the American Israel Public Affairs Committee ("AIPAC") was not a "political committee" and thus was not required to disclose its disbursements and receipts. *See Akins,* 524 U.S. at 21, 118 S.Ct. 1777. Recognizing that a plaintiff does suffer an injury in fact "when the plaintiff fails to obtain information which must be publicly disclosed pursuant to statute," the Supreme Court stated that "[t]here is no reason to doubt [plaintiffs'] claim that the information would help them (and others to whom they would communicate it) to evaluate candidates for public office . . . and to evaluate the role that AIPAC's financial assistance might play in a specific election." *Id.* Accordingly, the Supreme Court found that the plaintiffs had stated an injury in fact. *See id.*

The FEC argues that the plaintiffs cannot assert any informational injury because if the plaintiffs win on the merits, CPD would be unable to finance candidate debates and would disband leaving no receipts or disbursements to report. Further, the FEC claims that the plaintiffs are not really after a list of the CPD's expenditures and receipts, but simply want to know whether a violation of the law occurred. The D.C. Circuit has held that when a plaintiff merely wants the FEC to

"get the bad guys" rather than force disclosure of information, the plaintiffs do not state a concrete and particularized injury. *Common Cause v. FEC*, 108 F.3d at 418; *see also Judicial Watch, Inc. v. FEC*, 180 F.3d at 278.

I find *Akins* to be on point but *Common Cause v. FEC* and *Judicial Watch* to be distinguishable. In the latter two cases, the D.C. Circuit noted that the analysis of informational injury "must turn on the nature of the information allegedly denied." *Judicial Watch*, 180 F.3d at 278 (citing *Common Cause v. FEC*, 108 F.3d at 108). The respective plaintiffs in those cases could not allege an informational injury because they had both failed to state clearly in their administrative complaints what information they were seeking. *See Judicial Watch*, 180 F.3d at 278 ("Judicial Watch has not even made a nominal allegation of reporting violations"); *Common Cause v. FEC*, 108 F.3d at 418 (Common Cause's allegation of reporting violations was "nominal at best" and the relief requested "consisted entirely of the investigation and imposition of monetary penalties against" the alleged violators). By contrast, the plaintiffs in *Akins* had explicitly asked the FEC "to order AIPAC to make public the information that FECA demands of a 'political committee.' " *Akins*, 524 U.S. at 16, 118 S.Ct. 1777.

Here, plaintiffs' administrative complaint not only alleged more than a "nominal" violation of the FECA's registration and reporting requirements, but also requested that the FEC take action to correct that violation. Plaintiffs' administrative complaint set forth in detail their theory that the CPD is a "political committee" that has failed to comply with the FECA's registration and reporting requirements. Moreover, in their demand for relief, plaintiffs requested that the FEC "take any and all action in within its power to correct and prevent the continued illegal activities of the CPD." (Admin.Compl. at 32.) If the FEC had agreed that the CPD is a "political com-

mittee" as defined in FECA, then any order "correcting" the CPD's "illegal activities" presumably would require it to register and report. Thus, *Akins* controls here.

■ Defendant's claim that the CPD would disband before it agreed to register and report is speculative. The fact that AIPAC might have disbanded if they were ordered to register and report presumably would have had no effect on the Supreme Court's decision in *Akins*. Indeed, the *Akins* Court recognized that the plaintiffs had standing despite the fact that the they might not ultimately obtain the relief they sought. *See Akins*, 524 U.S. at 25, 118 S.Ct. 1777. Thus, I find that plaintiffs have made a sufficient showing of informational injury.

### 2. *Causation*

The FEC argues that plaintiffs have failed to show that any purported harm they will suffer is fairly traceable to the FEC's dismissal of their administrative complaint. It cites the general proposition that, in cases where the "asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of someone else," standing is often difficult to establish because "one or more of the essential elements of standing 'depends on the unfettered choices made by independent actors not before the court whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict.' " *Lujan*, 504 U.S. at 562, 112 S.Ct. 2130 (quoting *ASARCO Inc. v. Kadish*, 490 U.S. 605, 615, 109 S.Ct. 2037, 104 L.Ed.2d 696 (1989)).

In support of their argument, the FEC again places heavy reliance on *Fulani v. Brady* which held that the alleged harm Fulani faced by being excluded from the debates could not fairly be traced back to IRS's decision to grant the CPD tax-exempt status. The Court of Appeals reasoned that the FEC's regulations were an intervening causal agent because "were it not for the [FEC] regulation, the CPD's

tax status would be relevant to its sponsorship of the debates only insofar as it facilitated the CPD's funding through tax-exempt funds." *Fulani v. Brady*, 935 F.2d at 1329. Further, the panel opined that "even assuming the FEC continues to adhere to its present regulations, the CPD remains an intervening causal agent." *Id.* It reasoned that if the CPD were threatened with revocation of its tax-exempt status, the CPD could either decline to sponsor the debates or could choose to include Fulani, in which case the two major-party candidates might decline to participate. *Id.* Thus, the FEC's regulations, the CPD, and the major-party candidates were all intervening causal agents beyond the court's control.

The FEC's reliance on *Fulani v. Brady* is again misplaced. The causal nexus in that case was far more attenuated than it is here. Although it is true that the D.C. Circuit suggested in dicta that the CPD and the candidates were intervening causal agents, the fact that Fulani sued the IRS rather than the FEC proved dispositive. Here, by contrast, plaintiffs have sued the FEC which, unlike the IRS, is charged with enforcing the regulations governing presidential debates. By eliminating the IRS as a link in the chain of causation, plaintiffs take a giant leap closer to the actual source of their harm. As the Supreme Court has more recently noted, "if the reviewing court agrees that the agency misinterpreted the law, it will set aside the agency's action and remand the case— even though the agency (like a new jury after a mistrial) might later, in the exercise of its lawful discretion, reach the same result for a different reason." *Akins*, 524 U.S. at 25, 118 S.Ct. 1777. Thus, the mere fact that Buchanan may ultimately be thwarted in his attempts to get into the debates is insufficient to deprive him of standing to challenge the CPD's debate criteria. He and the other plaintiffs are harmed simply by the FEC's purportedly unlawful failure to require that the CPD report its receipts and expenditures and use objective criteria.

■ The CPD and the major-party candidates are not intervening causal agents sufficient to break the chain of causation. If, on remand, the FEC were to find that the CPD was not in compliance with the debate-staging regulations, then the CPD would have two choices. It could either (1) refrain from putting on its debates (in which case the competitive harm to the plaintiffs from the CPD's purportedly subjective debate criteria would be ceased), or (2) change its participation criteria so that they were objective. Similarly, if the candidates decided not to participate in the CPD's debates, they either could elect not to debate, which would again eliminate the competitive harm to the plaintiffs, or they could select another debate sponsor that did comply with the FEC's regulations. In all of these circumstances, the "independent actors" are not in a position to make "unfettered choices" completely beyond the court's or the FEC's control. *Lujan*, 504 U.S. at 562, 112 S.Ct. 2130 (internal quotations and citation omitted). They are constrained by the FEC's regulatory framework which requires that debate-staging organizations use objective criteria and not endorse, support, or oppose any candidate or party. Accordingly, I find that the plaintiffs' injuries are "fairly traceable" to the FEC's conclusion that the CPD's debate criteria were objective.

### 3. *Redressability*

Lastly, plaintiffs must prove that it is likely, as opposed to merely speculative, that the injury will be redressed by a ruling in its favor. As the D.C. Circuit has noted, "[w]hen plaintiffs' claim hinges on the failure of the government to prevent another party's injurious behavior, the 'fairly traceable' and redressability inquiries appear to merge." *Freedom Republicans, Inc. v. FEC*, 13 F.3d 412, 418 (D.C.Cir.1994) (citing *Competitive Enter. Inst. v. NHTSA*, 901 F.2d 107, 113 (D.C.Cir.1990)). Although causation focuses on the past and redressability focuses

on the future, "both prongs ... can be said to focus on principles of causation: fair traceability turns on the causal nexus between the agency action and the asserted injury, while redressability centers on the causal connection between the asserted injury and judicial relief." *Id.* (citing *Allen v. Wright,* 468 U.S. 737, 753 n. 19, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984)). Plaintiffs "need not prove that granting the requested relief is certain to redress their injury, especially where some uncertainty is inevitable." *Competitive Enter. Inst.,* 901 F.2d at 118 (citations omitted).

■ The FEC argues that plaintiffs' alleged injury cannot be redressed if this case is remanded to the FEC because nothing this Court does is "binding on CPD, which is not even a party before this Court." (Def.'s Mem.Supp.Summ.J. at 19.) It also argues that there is no way to guarantee that, on remand, the CPD would ultimately be required to change its debate criteria before the debates because it might take months for the FEC go through the three-step process for bringing an enforcement action against the CPD. I reject both of these arguments for essentially the same reason that I rejected the FEC's causation argument.

■ As previously discussed, the Supreme Court made clear in *Akins* that the fact that an agency might not ultimately find in the plaintiffs' favor on remand does not destroy the plaintiff's standing to challenge the agency's decision. *See Akins,* 524 U.S. at 25, 118 S.Ct. 1777. It is enough that a remand "would leave the agency free to exercise its discretion in a proper manner [which] *could* lead to agency action that would redress [plaintiffs'] injury...." *Competitive Enter. Inst.,* 901 F.2d at 118 (emphasis added). Here, the FEC could ultimately find that the CPD is a "political committee" and that its debate criteria are subjective. As a consequence, the FEC could take enforcement action, either via conciliation or a civil action, to stop and correct the CPD's violations of the law.

I also am unconvinced that there is not enough time as a practical matter for the plaintiffs to obtain the relief they seek from the FEC. The FEC's argument assumes that it would take the maximum amount of time allowed under the FECA to process plaintiffs' claim. *See* 2 U.S.C.A. § 437g (West Supp.2000) (giving the FEC thirty days to respond to the court order, the CPD fifteen days to respond to the FEC's decision, and the FEC another thirty to ninety days to attempt to address any violation through conciliation before voting to bring a civil action). However, there is nothing to prevent the FEC from expediting its review. More fundamentally, if the FEC's own enforcement procedures could frustrate the plaintiffs from challenging the agency's decision, then the FEC's decisions regarding the propriety of debate criteria or other election-related matters often would be unreviewable. *See Akins v. FEC,* 101 F.3d 731, 738 n. 7 (D.C.Cir.1996) (*en banc* ) (noting that political action committee's alleged failure to disclose past contributions and expenditures would affect future voters and that "[i]f such injury were not redressable, once an election ended virtually all electoral conduct would be beyond review"), *vacated and remanded on other grounds, FEC v. Akins,* 524 U.S. 11, 118 S.Ct. 1777, 141 L.Ed.2d 10 (1998). Such a result would read FECA's judicial review provision out of the statute without any constitutionally sound rationale.

Because I find that a remand to the agency would require the FEC to reassess whether the CPD is a nonpartisan organization utilizing objective selection criteria, plaintiffs have satisfied the all three elements of constitutional standing. I therefore will address their claim on the merits.

## II. *The Merits*

### A. *Standard of Review*

FECA provides that the reviewing court must determine whether the FEC's dismissal of the administrative complaint

is "contrary to law." 2 U.S.C. § 437g(8)(C). It is well-settled that "[a] court may not disturb a[FEC] decision to dismiss a complaint unless the dismissal was based on 'an impermissible interpretation of the [FECA] ... or was arbitrary or capricious, or an abuse of discretion.'" *Common Cause v. FEC*, 108 F.3d at 415 (quoting *Orloski v. FEC*, 795 F.2d 156, 161 (D.C.Cir.1986)). The Supreme Court has noted that the FEC "is precisely the type of agency to which deference should presumptively be afforded" because "Congress has vested the [FEC] with the 'primary and substantial responsibility for administering and enforcing [FECA].'" *FEC v. Democratic Senatorial Campaign Comm. ("DSCC")*, 454 U.S. 27, 37, 102 S.Ct. 38, 70 L.Ed.2d 23 (1981) (quoting *Buckley v. Valeo*, 424 U.S. 1, 109, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976)).

■ Deference is particularly appropriate in this case because it involves the FEC's interpretation of its own regulations. An agency's construction of its own regulations is entitled to an "exceedingly deferential standard of review" such that the court " 'is not to decide which among several competing interpretations best serves the regulatory purpose.'" *Trinity Broadcasting of Florida, Inc. v. FCC*, 211 F.3d 618, 625 (D.C.Cir.2000) (quoting *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994)); *see also Wyoming Outdoor Council v. United States Forest Serv.*, 165 F.3d 43, 52 (D.C.Cir.1999) (according "substantial deference" to agency's interpretation of its own regulations). Thus, "the agency's construction of its own regulation is controlling 'unless it is plainly erroneous or inconsistent with the regulation.'" *Wyoming Outdoor Council*, 165 F.3d at 52 (quoting *United States v. Larionoff*, 431 U.S. 864, 872, 97 S.Ct. 2150, 53 L.Ed.2d 48 (1977)). As the D.C. Circuit has stated, when a plaintiff is not alleging that the regulation itself violates the statute or the Constitution, "the only circumstance in which we do not defer is where 'an alterna-

tive reading is compelled by the regulation's plain language or by other indications of the [agency's] intent at the time of the regulation's promulgation.'" *S.G. Loewendick & Sons, Inc. v. Reich*, 70 F.3d 1291, 1294 (D.C.Cir.1995) (quoting *Thomas Jefferson*, 512 U.S. at 512, 114 S.Ct. 2381) (second internal quotations and citation omitted).

Similarly, a court will find an abuse of discretion only when the agency cannot meet "its minimal burden of showing a 'coherent and reasonable explanation for its exercise of discretion.'" *Carter/Mondale Presidential Comm., Inc. v. FEC*, 775 F.2d 1182, 1185 (D.C.Cir.1985) (quoting *MCI Telecom. Corp. v. FCC*, 675 F.2d 408, 413 (D.C.Cir.1982)). When the FEC's rationale for dismissing the plaintiffs' complaint is included in the General Counsel's Report, the court may rely upon it in the absence of a statement of reasons from the FEC itself. *See Carter/Mondale*, 775 F.2d at 1187 ("[T]hough helpful to a court on review, a statement of reasons by FEC itself is not required, and absence of an express statement does not render its action unlawful where reasons for that action may be gleaned from its staff's reports.") In this case, I glean from the General Counsel's report a reasonable basis for its rejection of plaintiffs' allegations which was based on a reasonable interpretation of 11 C.F.R. § 110.13.

### B. *CPD's Status As A Debate Sponsoring Organization*

The General Counsel found, and the FEC agreed, that plaintiffs failed to provide enough evidence to establish a reason to believe that the CPD is a partisan organization unable to qualify under the safe harbor as an organization that does not "endorse, support, or oppose political candidates or political parties." 11 C.F.R. § 110.13(a)(1). The General Counsel determined that plaintiffs' evidence failed to show: (1) that "the CPD is controlled by"

the two major parties;[8] (2) that "any officer or member of the DNC or RNC is involved in the operation of the CPD"; and (3) that "the DNC and RNC had input into the development of the CPD's candidate selection criteria for the 2000 presidential election cycle." (AR Tab 14 at 15.)

The evidence submitted by the plaintiff in support of its contention that the CPD operates for the benefit of the two major parties consisted of three primary elements. First, plaintiffs emphasized the circumstances surrounding the CPD's formation. The CPD was formed in 1985 by Frank J. Fahrenkopf, Jr. and Paul G. Kirk, Jr. when they were the respective Chairmen of the Republican National Committee ("RNC") and Democratic National Committee ("DNC"). Although Messrs. Fahrenkopf and Kirk are no longer party chairmen, they are still the co-chairmen of the CPD. Moreover, since the CPD's inception, the members of the its Board of Directors have consisted largely of current and former elected officials from both parties as well as party activists.

Second, plaintiffs cited two written statements issued in the mid–1980s when the CPD was formed. The first was a "Memorandum of Agreement on Presidential Candidate Joint Appearances" dated November 26, 1985, and the second was a joint news release entitled "RNC and DNC Establish Commission on Presidential Debates" dated February 18, 1987. (Admin.Compl.Exs.7, 8.) Both documents were issued jointly by the two major parties and described the CPD as a "bipartisan" organization designed to sponsor nationally televised debates between the two major parties' nominees.

Finally, plaintiffs provided evidence which they contend indicates that the two major parties exerted control and influence over the CPD during the past three sets of presidential debates. In particular, they cited the congressional testimony of an official of President Bush's 1992 campaign which suggested that the two major parties, as opposed to the CPD's pre-established criteria, determined whether third-party presidential candidate Ross Perot would be allowed to participate in the debates.[9] Plaintiffs also cited a 1998 FEC General Counsel's Report addressing complaints similar to plaintiffs' that were brought by the Natural Law Party and Perot '96. In that report, the General Counsel found that there was evidence that the two parties had an influence on the CPD's selection criteria for the 1996 presidential debates. (Admin-Compl.Ex.19.) The General Counsel cited a conference entitled "Campaign Decision Makers" which was held after the 1996 election and included representatives of the Clinton/Gore, Dole/Kemp, and Perot campaigns as well as one of the CPD's co-chairmen and the chairman of the CPD's Advisory Committee. (*Id.* at 20.) A transcript of that conference revealed that the two major parties may have played a role in the decision to exclude Perot from the debates. (*Id.*) In that transcript, George Stephanopoulos, then-Senior Advisor to President Clinton, was quoted as saying with respect to Dole/Kemp:

> They didn't have leverage going into the negotiations. They were behind, they needed to make sure Perot wasn't in it.

---

8. Plaintiffs argue that the FEC applied the wrong standard, that of "control" over the CPD, rather than whether the CPD simply "endorse[s], support[s], or oppose[s]" political candidates or parties. 11 C.F.R. § 110.13(a)(1). I read the General Counsel's statement as geared toward refuting the specific contention made in plaintiffs' administrative complaint that the CPD was created to give the two major parties "control over" the presidential debates. (Admin.Compl. at 14.)

9. According to the Bush campaign's General Counsel, the CPD did not want to invite Mr. Perot, but "the Bush campaign insisted, and the Clinton campaign agreed, that Mr. Perot and Admiral Stockdale be invited to the debates." *Presidential Debates: Hearing Before Subcomm. on Elections of the Comm. on House Admin.*, 103d Cong., 1st Sess. 44, 50–51 (June 17, 1993) (testimony of Bobby R. Burchfield).

As long as we could agree to Perot not being in it we would get everything else we wanted going in. We got our time frame, we got our length, we got our moderator.

(*Id.*) (quoting *Campaign for President: The Managers Look at '96*, 170 (Harvard Univ. Inst. of Pol., ed.1997)). Plaintiffs argue that this evidence of a pattern of influence during the past three sets of debates should have created at least a "reason to believe" that the CPD has favored the two major parties during this 2000 election cycle. They do concede, though, that there is no hard contemporaneous evidence that the CPD is being influenced by the two major parties now.

Balanced against this evidence of past favoritism and influence were the responses to the plaintiffs' complaint from the CPD, RNC, and DNC. In a sworn declaration, Janet H. Brown, the CPD's Executive Director, stated that the CPD received no funding from any political party, that not every member of the twelve-member Board of Directors identified with the Democratic or Republican parties,[10] and that "[n]o CPD board member is an officer of either the [DNC] or [RNC]." (AR Tab 13, Brown Decl. at ¶¶ 5–6, 11.) The CPD's response also noted that one of the three sets of debates it has sponsored since 1988 did include three candidates. Brown said that in 1992, because Ross Perot and his running mate, Admiral James B. Stockdale, satisfied the CPD's then-existing selection criteria, they participated in three presidential debates and one vice-presidential debate. (*Id.* at ¶ 22.) Brown also stated that "[t]he CPD's 2000 Criteria were not adopted with any partisan (or bipartisan) purpose" nor were they "adopted with the intent to keep any party or candidate from participating in the CPD's debates or to bring about a preordained result." (*Id.* at ¶ 33.)

The DNC and RNC also disclaimed any involvement with the CPD. In its response, the DNC stated that it "has no connection or relationship whatsoever with the . . . [CPD]" and that "[t]he DNC does not now play, nor has it ever played, any role in determining the criteria for inclusion of candidates in any debates sponsored by the CPD . . . ." (AR Tab 11.) Likewise, the RNC disavowed any affiliation with the CPD or influence on the CPD's debate criteria. (AR Tab 12.)

Plaintiffs' argument makes sense, and the evidence they have marshaled in support of it is not insubstantial. An ordinary citizen might easily view the circumstances surrounding the creation of the CPD along with the evidence of major-party influence over the past three debates as giving some "reason to believe" that the CPD always has supported, and still does support, the two major parties to the detriment of all others. But, for better or worse, that is not the standard I must apply here.

As the D.C. Circuit has noted, "[t]he 'reason to believe' standard . . . itself suggests that the FEC is entitled, and indeed required, to make subjective evaluation of claims." *Orloski*, 795 F.2d at 168. Thus, the FEC is expected to weigh the evidence before it and make credibility determinations in reaching its ultimate decision. *See id.* As long as the FEC presents a coherent and reasonable explanation of that decision, it must be upheld. *See Carter/Mondale*, 775 F.2d at 1185.

■ Here, the General Counsel's terse explanation could have been more clear and thorough. However, it is apparent from the report that in the absence of any contemporaneous evidence of influence by the major parties over the 2000 debate criteria, the FEC found evidence of possible past influence simply insufficient to justify disbelieving the CPD's sworn statement, corroborated by the DNC and RNC, that the CPD's 2000 debate criteria were neither influenced by the two major parties nor designed to keep minor parties out

---

10. Ms. Brown stated that she was "not aware of what party, if any, Board members Dorothy Ridings or Howard Buffett would identify with if asked." (Brown Decl. at ¶ 11.)

of the debates. While reasonable people could certainly disagree about whether the CPD's credibility determination was correct, under the extremely deferential standard of review that I must apply, the FEC is entitled to the benefit of the doubt even if the unfortunate by-product of the FEC's decision is increased public cynicism about the integrity of our electoral system. Based on the factual record that was before it, the FEC did not abuse its discretion in finding that there was "no reason to believe" that the CPD currently "do[es] not endorse, support, or oppose political candidates or political parties." 11 C.F.R. § 110.13(a)(1).

### C. The CPD's Selection Criteria

For the CPD to be found in compliance with the FEC's debate regulations, the FEC was required to find not only that the CPD does not support, endorse, or oppose political candidates, but also that it is basing its selection of participants on "preestablished and objective criteria." 11 C.F.R. § 110.13(c). The dispute here centers on whether it was unreasonable for the FEC to conclude that the CPD employed an "objective" criterion when it required that participants have "a level of support of at least 15% (fifteen percent) of the national electorate as determined by five selected national public opinion polling organizations, using the average of those organizations' most recent publicly reported results at the time of the determination." (AR Tab 1 Ex. 1 at 2.)

As the D.C. Circuit has noted, 11 C.F.R. § 110.13(a) "does not spell out precisely what the phrase 'objective criteria' means...." *Perot v. FEC*, 97 F.3d 553, 560 (D.C.Cir.1996), *cert. denied*, 520 U.S. 1210, 117 S.Ct. 1692, 137 L.Ed.2d 819 (1997). The regulation therefore does not "mandat[e] a single set of 'objective criteria' all staging organizations must follow" but rather "[gives] the individual organizations leeway to decide what specific criteria to use." *Id.* at 559 (citing 60 Fed.Reg. 64,262 (1995)). As a result, "[t]he authori-

ty to determine what the term 'objective criteria' means rests with the agency ... and to a lesser extent with the courts that review agency action." *Id.* at 560.

Although the term "objective" is not defined in the regulation, its has generally been described by courts as referring to evidence of "the sort that can be supplied by disinterested third parties," *Bourke v. Dun & Bradstreet Corp.*, 159 F.3d 1032, 1037 (7th Cir.1998) (internal quotation and citation omitted), "that can be discovered and substantiated by external testing," *Thompson v. Sullivan*, 987 F.2d 1482, 1488–89 (10th Cir.1993), or evidence that is undistorted "by personal feelings or prejudices and that are publicly or intersubjectively observable or verifiable, especially by scientific methods." *Association of the Bar of the City of New York v. Commissioner of Internal Revenue*, 858 F.2d 876, 880 (2d Cir.1988) (citation omitted). Objective representations have also been described "as 'representations of previous and present conditions and past events, which are susceptible of exact knowledge and correct statement.'" *Id.* (quoting *United Ben. Life Ins. Co. v. Knapp*, 175 Okla. 25, 51 P.2d 963, 964 (1935)).

Plaintiffs contend that the CPD's selection criteria do not qualify as objective under any of these definitions. First, they argue that "[t]he choice of fifteen percent as the level of support required is entirely subjective" chiefly because a candidate who receives a mere 5% of the popular vote in the general election would qualify his or her party to receive federal funding in the next election. (Pl.'s Mem.Supp. Summ.J. at 22.) I find this argument unconvincing. While I agree that a 5% support level or the automatic inclusion of any candidate whose party qualified for federal funding in the last election would probably be an objective selection criteria, that does not necessarily imply that a 15% support level is somehow subjective. The FEC specifically declined to adopt a rule mandating any one standard. *See Perot v. FEC*, 97 F.3d at 559–60. While plaintiffs

have noted that the Final Draft Rule submitted by the General Counsel to the FEC in 1994 included polls on a list of nonobjective criteria, (Agenda Document, 94–11, Federal Election Comm'n (Feb. 8, 1994), at 73–74), the drafters' rejection of the General Counsel's suggestion manifests a clear intent on their part not to preclude debate sponsors from using polls.

A reasonable person could find it ironic that a candidate need win only 5% of the popular vote to be eligible for federal funding, but must meet a 15% threshold to be eligible for the debates. However, the relevant test is not based on irony, but on objectivity. So long as the 15% support level is sufficiently measurable and verifiable, it would appear to satisfy at least the common definition of an objective requirement. Thus, how the 15% is measured, and whether it can be measured with some degree of precision, generally has more bearing on its objectivity or lack of objectivity than the mere establishment of the 15% level itself.

This is not to say, however, that any pre-established required level of support would necessarily satisfy the regulation's definition of objectivity. The history of 11 C.F.R. § 110.13 makes clear that, although the word "reasonable" does not appear in the regulation's text, "reasonableness is implied." 60 Fed.Reg. 64,262 (1995). The FEC also stated in its rule making that "[s]taging organizations must be able to show that their objective criteria were used to pick the participants, and that the criteria were not designed to result in the selection of certain pre-chosen participants." *Id.* Taken together, these statements by the regulation's drafters strongly suggest that the objectivity requirement precludes debate sponsors from selecting a level of support so high that only the Democratic and Republican nominees could reasonably achieve it.

■ In view of the substantial deference I must accord to the FEC's interpretation of its own regulations, I cannot conclude that it was plainly erroneous or

inconsistent with the regulation for the FEC to find that the 15% support level set by the CPD is "objective" for the purposes of 11 C.F.R. § 110.13(c). As Brown indicated in her declaration, several third party candidates have in the past achieved over 15% support in the polls taken at or around the time that the debates are traditionally held. For instance, by September of 1968, George Wallace had achieved a level of support of approximately 20% in the polls. John Anderson was invited by the League of Women Voters to participate in the 1980 presidential debates after his support level reached approximately 15%. Finally, in 1992, Ross Perot's standing in the polls was near 40% at some points and he ultimately received 18.7% of the popular vote that year. (Brown Decl. at ¶ 35.) Thus, third party candidates have proven that they can achieve the level of support required by the CPD. While a lower threshold of support might be preferable to many, such a reading is neither compelled by the regulation's text nor by the drafters' intent at the time the regulation was promulgated. Accordingly, deference to the FEC's interpretation is warranted.

Plaintiffs' second line of attack assaults the CPD's methodology for determining which candidates meet the 15% threshold. They argue that the "CPD's method for determining whether a candidate meets this threshold is also filled with subjective determinations, inaccurate methodologies, and uncertainty." (*Id.* at 23.) They contend that polling is by definition an inexact science because "even the best polls have significant margins of error." (Pls.' Mem. Supp.Summ.J. at 24.) Moreover, plaintiffs note that polls are susceptible to subjective influence by the pollster's choice of who gets polled, how the questions are worded, the names of the candidates included, and when the polls are taken.

While all of plaintiffs' contentions may have merit as factual matters, I cannot conclude that they render unreasonable the FEC's decision that the CPD's debate

criteria are objective. All polls have a margin of error. However, some degree of imprecision is inevitable in almost any measurement. Such imprecision alone does not make a predictor subjective such that it favors one group of candidates over another.

Plaintiffs contend that the polls' margin of error could result in a third party candidate being unfairly excluded from the debates. For instance, they posit a candidate whose actual level of support in the electorate is 18%, but whose polled level of support is only 14% because of the poll's plus or minus 4% margin of error. The same 4% margin of error, though, could just as easily push into the debate a third party candidate who had only 11% actual support. In other words, a poll's margin of error may be equally likely to increase the number of debate participants as to decrease them. Although the plaintiffs did submit evidence about the problems associated with polling, plaintiffs did not present any evidence to suggest that these problems would systematically work to minor-party candidates' disadvantage.

Plaintiffs also contend that pre-debate polls are misleading because the debates themselves can substantially affect a candidate's viability. However, plaintiffs' argument puts the cart before the horse. The FEC determined in promulgating 11 C.F.R. § 110.13 that debate staging organizations such as the CPD must be given latitude in formulating their debate criteria. *See* 60 Fed.Reg. 64,262. It is difficult to understand why it would be unreasonable or subjective to consider the extent of a candidate's electoral support prior to the debate to determine whether the candidate

is viable enough to be included. The FEC itself recognized this point in dismissing two related complaints regarding the 1996 CPD's debate criteria. In its Statement of Reasons for the dismissal, the FEC noted that it had explicitly rejected the General Counsel's suggestion that 11 C.F.R. § 110.13 explicitly precludes consideration of pre-debate polls: "Under the staff's proposed regulation, a debate sponsor could not look at the latest poll results even though the rest of the nation could look at this as an indicator of a candidate's popularity. This made little sense to us." *Statement of Reasons on MURs 4451 & 4473*, Federal Election Comm'n 8 n. 7 (1998). Thus, the language and history of 11 C.F.R. § 110.13 all suggest that it is not inappropriate for debate sponsors to consider pre-debate polls.

In finding that the CPD's method was objective, the FEC relied on its own precedent from the 1996 election that "[w]ith respect to polling and electoral support, the Commission ... declined to preclude the use of polling or 'other assessments of a candidate's chances of winning the nomination or election' when promulgating 11 C.F.R. § 110.13." (AR Tab 14 at 16.) The General Counsel also pointed out that the CPD's 2000 debate criteria were actually more objective than the CPD's 1996 criteria which had been upheld even though they included decidedly less precise ways of measuring a candidate's level of support in the electorate. (AR Tab 14 at 17.)[11] While FEC precedent is not binding on this Court, an agency's consistency with its own past rulings is certainly an indicium of reasonableness. *See DSCC*, 454 U.S. at

11. In 1996, the FEC upheld CPD criteria which included consideration of the following:

> [P]rofessional opinions of Washington bureau chiefs of major newspapers, news magazines and broadcast networks; the opinions of professional campaign managers and pollsters not employed by the candidates; the opinions of representative political scientists specializing in electoral politics; a comparison of the level of cover-

age on front pages of newspapers and exposure on network telecasts; and published views of prominent political commentators. (AR Tab 14 at 17.) The Supreme Court has also characterized a congressional candidate's exclusion from a debate based on somewhat similar factors as demonstrative of the candidate's "own *objective* lack of support...." *Arkansas Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 683, 118 S.Ct. 1633, 140 L.Ed.2d 875 (1998) (emphasis added).

37, 102 S.Ct. 38 (noting that "thoroughness, validity, and *consistency* of an agency's reasoning are factors that bear on the amount of deference to be given an agency's ruling") (emphasis added); *In re Sealed Case,* 223 F.3d 775, 783 (D.C.Cir. 2000).

With respect to the plaintiffs' argument that "subjective elements" could creep into the polls themselves, plaintiffs presented no evidence to suggest that any of the five polling organizations who will conduct the polls are biased for or against any candidate or party. Indeed, the fact that the average of five polls are being used would appear to reduce the probability of manipulation, even if plaintiffs are right that a weighted approach which accounted for differences in sample sizes amongst the polls might produce more a reliable result. (Admin.Compl.Ex.20.) While it may be true that polls can be misused, without at least some evidence that the independent pollsters have an incentive to rig the process in favor or against any candidate or party, I cannot conclude that the FEC's finding of objectivity was unreasonable.

In view of the entire record, I find that it was not arbitrary or capricious. for the FEC to conclude that the CPD's selection criteria are objective. Plaintiffs failed to present significant evidence demonstrating that the FEC's interpretation of 11 C.F.R. § 110.13 was either at odds with the regulation's plain language or the FEC's intent at the time that the regulation was promulgated. I also find that the FEC provided a "sufficiently reasonable" explanation for its decision which was consistent with FEC precedent. *DSCC,* 454 U.S. at 39, 102 S.Ct. 38. Although it might be good public policy to allow more third party candidates into the presidential debates, "[t]he responsibilities for assessing the wisdom of such policy choices and resolving the struggle between competing views of the public interest are not judicial ones: 'Our Constitution vests such responsibilities in the political branches.'" *Chevron,*

*U.S.A., Inc. v. NRDC,* 467 U.S. 837, 866, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) (quoting *TVA v. Hill,* 437 U.S. 153, 195, 98 S.Ct. 2279, 57 L.Ed.2d 117, (1978)).

## CONCLUSION

The plaintiffs do have standing to bring their claims because they have stated both competitive and informational injuries that were caused by the FEC's dismissal of their complaint and could be redressed by a court-ordered remand to the agency. However, plaintiffs' claims fail on the merits because they have not overcome their heavy burden of showing that the FEC's interpretation of its own regulation was erroneous or that its explanation for its decision was incoherent or unreasonable. Accordingly, defendant's motion for summary judgment will be granted and plaintiffs' motion will be denied. An Order consistent with this Opinion is being issued today.

## ORDER AND JUDGMENT

For the reasons set forth in the Memorandum Opinion issued today, it is hereby

ORDERED that plaintiffs' Motion for Summary Judgment [10] be, and hereby is, DENIED. It is further

ORDERED that defendant's Motion for Summary Judgment [9] be, and hereby is, GRANTED. It is further

ORDERED that judgment be entered in favor of the defendant.

This is a final appealable Order.