John HAGELIN, et al., Plaintiffs,

v.

FEDERAL ELECTION COMMISSION, Defendant.

No. CIV.A.04–00731(HHK).

United States District Court, District of Columbia.

Aug. 12, 2004.

Alan Robert Kabat, Lynne A. Bernabei, Bernabei & Katz, PLLC, Washington, DC, Brenda Wright, Bonita Tenneriello, National Voting Rights, Jason B. Adkins, Adkins, Kelston & Zavez, P.C., Boston, MA, for Plaintiffs.

Kathleen Monaghan, Federal Election Commission, Washington, DC, for Defendant.

### MEMORANDUM OPINION

KENNEDY, District Judge.

John Hagelin, Ralph Nader, Patrick Buchanan, Howard Phillips, Winona LaDuke, the Natural Law Party, the Green Party of the United States, and the Constitution Party (collectively "plaintiffs") bring this action against the Federal Election Commission ("FEC") charging that the FEC erroneously dismissed their administrative complaint. Their complaint alleged that the Commission for Presidential Debates ("CPD") is a partisan organization and thus could not, and can not, lawfully sponsor presidential debates, events that can only be staged lawfully by a non-profit, non-partisan organization. Before the court are the parties' cross-motions for summary judgment. Upon consideration of the motions, the respective oppositions thereto, and the record of this case, the court concludes that plaintiffs' motion for summary judgment [Dkt. # 7] must be granted in part and denied in part, and that defendant's summary judgment motion [Dkt. # 11] must also be granted in part and denied in part.

### I. BACKGROUND

#### A. Statutory Background

The FEC is an independent agency with jurisdiction to administer and enforce the Federal Election Campaign Act ("FECA"). 2 U.S.C. § 431 *et seq.* FECA generally bars corporations from making "contributions" or "expenditures" in connection with any federal election. *Id.* § 441b(a). Political committees, *id.* § 431(4), may accept contributions or make expenditures in connection with a federal election, but they must first register with the FEC and report on all contributions and disbursements in accord with FECA and FEC regulations. *See id.* § 433–34; 11 C.F.R. § 102.1(d).

FECA provides safe harbors from these prohibitions and requirements. In particular, one safe harbor provision indicates that "expenditures" do not include "nonpartisan activity designed to encourage individuals to vote or to register to vote." 2 U.S.C. § 431(9)(B)(ii). An FEC regulation further interprets the safe harbor in § 431(9)(B)(ii) by excluding from the definitions of "contribution" and "expenditure" funds raised or spent to stage debates between candidates for elected office. 11 C.F.R. § 114.4(f)(1). Therefore, a nonprofit organization that does not "endorse,

support or oppose political candidates or political parties," *id.* § 110.13(a)(1), may accept and use corporate donations in order to stage candidate debates. *Id.* § 114.4(f)(1). That is, the organization staging a debate is eligible under the safe harbor only if, *inter alia*, it does not advance "one candidate over another." *Id.* § 110.13(b)(2).

A party who believes that he has been injured by violations of FECA or FEC regulations must first bring an administrative complaint before the FEC. 2 U.S.C. § 437g(a)(1). The FEC, in turn, will consider the complaint in a three-step process. *See Buchanan v. FEC,* 112 F.Supp.2d 58, 62 (D.D.C.2000). First, the FEC reviews the complaint and decides if there is "reason to believe" a FECA violation has occurred; if the FEC votes in the affirmative, it must conduct an investigation. 2 U.S.C. § 437g(a)(2). Second, after the investigation, the FEC takes another vote to determine if it has "probable cause" to believe a FECA violation has occurred; if the FEC votes in the affirmative, it must try to reach a conciliation agreement with the alleged FECA violator. *Id.* § 437g(a)(4)(A)(i). Third, if conciliation fails, the FEC votes on whether to initiate a civil action in federal court to enforce FECA. *Id.* § 437g(a)(6)(A). At each of the three stages, four or more FEC Commissioners must vote to proceed. If not, the FEC dismisses the complaint. The complainant may seek review of any dismissal in this court. *Id.* § 437g(a)(8)(A).

## B.  Factual Background

In 1987, members of the Democratic and Republican parties formed CPD, a private, non-profit corporation that sponsors and stages the debates for the United States presidential elections. It has staged debates for the 1988, 1992, 1996, and 2000 presidential elections. For the 2004 election, CPD will sponsor two presidential debates and one vice-presidential debate. CPD allegedly receives millions of dollars from corporations and wealthy donors to stage the presidential debates. How much CPD receives, exactly, and how it spends its money is unclear because the FEC has qualified CPD for the safe harbor provision under FECA and FEC regulations. As such, corporations may contribute money to CPD, and CPD need not report what it receives from corporations or how it spends that money.

Plaintiffs are political parties, other than the Republican and Democratic parties, and individuals who have sought presidential and vice-presidential election. Of the individual plaintiffs, only Nader is a candidate for the 2004 election. The others— Hagelin, Buchanan, Phillips, and La-Duke—were third-party presidential or vice-presidential candidates in 2000 who will not run in 2004. Both the Green and Constitution Parties, however, will have presidential candidates for the 2004 election. Neither Mr. Nader nor any person nominated by the Green or Constitutional Party is likely to be included in the 2004 debates under the eligibility rules established by CPD.[1] These rules allegedly dis-

---

1.  CPD's rules for participation in the debates include (1) proof of constitutional eligibility to run for president (e.g., age, birth in the United States),(2) registration in enough states such that the candidate could win the electoral college, and (3) a level of support of at least 15% of the national electorate as determined by the average of five selected national public

opinions polls by a certain time. *See Buchanan,* 112 F.Supp.2d at 61.

It is unlikely that any third-party candidate in 2004 will get more than 15% of the popular vote in a nationwide poll. However, in the present action, plaintiffs do not challenge CPD's rules of eligibility for participating in the presidential debates.

couraged Buchanan, Hagelin, Phillips and LaDuke from running in the 2004 election.

In June 2003, plaintiffs submitted a complaint against CPD to the FEC. Plaintiffs alleged that by structure, leadership and conduct, CPD was from its inception and continues to be a partisan organization, controlled by Democratic and Republican officials for the benefit of their respective parties. According to plaintiffs, the following facts show that CPD is, by structure and leadership, partisan: (1) CPD was founded by the two major parties; (2) since its founding in 1987, CPD has been co-chaired by Frank Fahrenkopf, Jr. and Paul Kirk, the former heads of the Republican and Democratic National Committees; (3) nine of eleven CPD directors are prominent Republicans or Democrats; and (4) no third-party member is a CPD director. Admin. Compl. ¶¶ 9, 11. Further, plaintiffs argued that CPD's current conduct shows it to be a partisan organization. Specifically, they pointed to evidence that CPD excluded all third-party candidates from entering the 2000 presidential debates as audience members, even if they had tickets. *Id.* ¶¶ 9–10. To its security staff at the 2000 debates, CPD distributed facebooks with pictures of most or all of the third party presidential and vice-presidential candidates, with orders not to let them into the debate halls. *See* A.R. at 20–22 (CPD, Untitled facebook of third party candidates). Plaintiffs allege that CPD did this to deny third party candidates the chance to campaign and to deny them access to the 1700 members of the media present at the debates. Admin. Compl. ¶ 10. Plaintiffs indicated that, acting as a partisan organization, CPD violat-

ed the FEC safe harbor regulations for organizations staging debates. *See* 11 C.F.R. § 110.13; *id.* § 114.4. As relief, plaintiffs asked the FEC to find that CPD was not qualified to stage debates in 2000, stop CPD from staging debates in 2004, bar CPD from raising contributions or making expenditures, and order CPD to file reports on its receipts and disbursements in 2000. Admin. Compl. at 11–12.

In March 2004, the FEC found no "reason to believe" that CPD violated FEC regulations and dismissed plaintiffs' complaint.[2] First, the FEC found that in 2000, it had previously dismissed the same allegations by plaintiffs that CPD's history, structure and leadership showed it to be partisan. *See* A.R. 385 (FEC General Counsel's Report at 4, Mar. 12, 2004) (citing the FEC's decisions in MUR 4987 and MUR 5004). The FEC notes that its 2000 decisions were upheld on review by the federal courts in the District of Columbia. A.R. 385 (*Id.* at 4 n. 4) (citing MUR 4987, MUR 5004, *Buchanan,* 112 F.Supp.2d 58, *aff'd on different grounds,* No. 00–5337 (D.C.Cir. Sept. 29, 2000)). Second, the FEC accepted CPD's justification for excluding third party candidates from the 2000 debates—that it did so, not out of partisanship, but out of concern that a third party candidate would disrupt the live broadcast of the debates. A.R. 388. The FEC found that CPD was concerned that Ralph Nader might try to stand up on stage, or that his supporters, who had protested at the debates and had broken into CPD's office in Washington, D.C., might also disrupt the debates. A.R. 388 (citing Loss Dep. at 48, Fahrenkopf Dep.

**2.** The FEC released no written opinion of its own dismissing MUR 5378. Instead it voted 5–0, with one abstaining, to adopt all the FEC General Counsel's report. A.R. 391–92 (Dove Aff. Mar. 18, 2004). When a party seeks judicial review of an FEC dismissal of an administrative complaint, and the FEC adopts the report of its General Counsel without issuing its own written opinion, the court reviews the General Counsel's report. *See Buchanan,* 112 F.Supp.2d at 62.

at 45). The FEC decided that the key issue was not whether CPD's concern was well-founded, but whether its actions were animated by partisanship. It found that CPD's actions in 2000 were not, and, thus, that there was no "reason to believe" CPD had violated FECA. The FEC dismissed plaintiffs' complaint. In the present action, plaintiffs seek review of the FEC's dismissal.

## II. ANALYSIS

### A. Legal Standard

■■■ The parties bring cross-motions for summary judgment, ordinarily governed by FED. R. CIV. P. 56. However, a specific standard of review applies to the present action: The FEC's dismissal of a complaint is proper if the dismissal was not "contrary to law." 2 U.S.C. § 437g(a)(8)(C). A FEC dismissal is contrary to law only if it was arbitrary, capricious, or an abuse of discretion. *Orloski v. Federal Election Comm'n*, 795 F.2d 156, 161 (D.C.Cir.1986). This standard of review is especially deferential when a plaintiff challenges the FEC's interpretation of its own regulations and not whether an FEC rulemaking violates FECA or the Constitution. *See Buchanan*, 112 F.Supp.2d at 70 (citing *Trinity Broadcasting of Florida, Inc. v. FCC*, 211 F.3d 618, 625 (D.C.Cir.2000) and *S.G. Loewendick & Sons, Inc. v. Reich*, 70 F.3d 1291, 1294 (D.C.Cir.1995)). An agency's interpretation of its own rules control unless "plainly

erroneous" or "inconsistent with the regulation." *Id.* (quoting *Wyoming Outdoor Council v. United States Forest Serv.*, 165 F.3d 43, 52 (D.C.Cir.1999)) (internal quotation marks omitted). However, agency decisions must be supported by the record. A court need not "accept meekly administrative pronouncements clearly at variance with established facts." *Antosh v. Federal Election Comm'n*, 599 F.Supp. 850, 853 (D.D.C.1984) (citing *Braniff Airways, Inc. v. Civil Aeronautics Bd.*, 379 F.2d 453, 463 (D.C.Cir.1967)) (internal quotation marks omitted). Decisions made without proper reference to the record suggest that an agency has not " 'genuinely engaged in reasoned decision making.' " *Id.* (quoting *Greater Boston Television v. FCC*, 444 F.2d 841, 851 (D.C.Cir.1970)).

### B. Exclusion of Third Party Candidates from the 2000 Debate Halls

■ Plaintiffs argue that FEC's dismissal of their complaint, finding no reason to believe a FECA violation had occurred, was erroneous. On review, plaintiffs ask the court to review "old" evidence of CPD's partisan slant and "contemporary" evidence of CPD's bias. The *Buchanan* court already considered plaintiffs' arguments and "old" evidence relating to CPD's history, structure and leadership, finding that such evidence of past, bi-partisan influence alone was insufficient to overturn FEC's determination that CPD was not currently partisan.[3] This was, in

---

[3.] 112 F.Supp.2d at 72–73. The *Buchanan* court found that plaintiffs' "arguments ma[de] sense," and that much evidence showed "CPD always has supported, and still does support, the two major parties to the detriment of all others." *Id.* at 72. However, that court held that it was compelled, by the extremely deferential standard of review applicable to the case, to uphold FEC's decision, finding no "reason to believe" CPD to be partisan. *Id.* at 72–73.

The court agrees with plaintiffs that *Buchanan* did not "dispositively resolve[ ]" whether or not CPD's history, structure and leadership was evidence of CPD's partisan nature. Pls.' Reply at 7. Rather, *Buchanan* held that such facts alone, without evidence of "contemporary" partisan actions, did not suffice to overturn FEC's "no reason to believe" finding. *See id.* at 72–73 (finding that, "in the absence of any contemporaneous evidence of influence by the major parties over the 2000

part, because in 2000, plaintiffs had conceded they had no "contemporaneous evidence that the CPD is being influenced by the two major parties now." *Id.* at 72. Plaintiffs now claim to have uncovered new "contemporaneous" evidence of CPD's partisan (or, rather, bi-partisan) leanings. They provide evidence that CPD excluded all third party candidates from the debate halls in 2000. The court finds the FEC's dismissal was contrary to law because the FEC ignored record evidence that CPD's exclusion of third party candidates from the debates was unrelated to a subjective or objective concern of disruption, and was therefore partisan.[4] The court therefore grants plaintiffs' motion for summary judgment on this issue.

With regard to plaintiffs' arguments on the exclusions, the FEC contends that,

first, CPD was not compelled to admit third party candidates to the debate halls, and, second, CPD excluded third party candidates for non-partisan reasons—fear that third party candidates or their supporters would disrupt the live telecast of the debates. Neither argument has merit.[5]

First, by suggesting that FECA did not compel CPD to admit third party candidates to the debates, FEC miscasts the relevant issue. Clearly FECA and FEC regulations do not require debate-staging organizations to admit all candidates to sit in the audience at debates. The absence of such a requirement, however, does not make irrelevant evidence of CPD's policy excluding third party candidates. Such exclusions could be evidence of partisan bias and, therefore, are relevant to whether

debate criteria," the court could not overturn the FEC's dismissal because "evidence of possible past influence [was] simply insufficient" to find that the CPD was partisan and aided the major parties in keeping third parties out of the debates).

**4.** Plaintiffs claim to have identified other "contemporary" evidence of CPD's partisanship, unavailable during *Buchanan*—that the Democratic and Republican Parties executed Memoranda of Understanding ("MOUs") with CPD to exclude or limit the participation of third party candidates in the 1992 and 1996 debates. *See* Pls.' Opp'n at 19 (citing Pls.' Exs. 2–3). Plaintiffs concede that the MOUs are not in the record but argue that the court should consider them anyway because they were before the FEC in another matter. *Id.* (noting that MOUs were before FEC in MUR 5414, brought by different plaintiffs against CPD on Feb. 19, 2004).

The FEC argues that the court may not consider the MOUs because it can only review records before the agency when it made the decision challenged by plaintiffs. *See* Def.'s Opp'n at 21–22 (citing *Appalachian Power Co. v. EPA*, 251 F.3d 1026, 1036 (D.C.Cir.2001) ("[O]bjections to agency action ... raised at the wrong time or in the wrong docket will not do")). FEC also argues that evidence in the agency's possession in a different adminis-

trative case can be considered in the present action only if timely brought to the agency's attention. *See id.* (citing *Nat'l Lime Ass'n v. EPA*, 233 F.3d 625, 641 (D.C.Cir.2000) ("The EPA is not required to consider in its deliberations here information apparently submitted in connection with a different rulemaking proceeding when no one timely asked it to do so."), and *Fund for Animals v. Williams*, 245 F.Supp.2d 49, 57 n. 7 (D.D.C.2003) (finding that it could not presume that the record "before" an agency included all "potentially relevant document existing within the agency")). FEC claims that plaintiffs did not timely bring the MOUs to their attention.

The court need not resolve the issue of whether it must consider the MOUs because it finds, based on other grounds, that FEC's dismissal was contrary to law. Nothing seems to bar plaintiffs presenting the MOUs before the FEC in future, remanded proceedings.

**5.** With regard to both arguments and more generally, it seems the FEC General Counsel Report on MUR 5378 summarily adopted the arguments made by CPD's counsel. *Compare generally* A.R. 57–62 (McGraw Mem. to FEC, Aug. 8, 2003) *with* A.R. 382–90 (FEC General Counsel Report, dated Mar. 12, 2004, adopted by FEC Commissioners on Mar. 18, 2004).

CPD violated the requirement that it be non-partisan, 11 C.F.R. § 110.13(a)(1). As such, it is necessary to grapple with the record of these exclusions.

Second, the record does not sustain FEC's finding that CPD excluded each and every third party candidates from the 2000 debates for non-partisan reasons. The record supports the idea that CPD excluded some candidates for fear that they would disrupt the debates, but the record does not support the assertion that CPD feared disruption by *all* candidates excluded.

The record does support the assertion that CPD excluded Ralph Nader and Pat Buchanan [6] from the 2000 debates for fear of disruption. That is, the record reflects CPD's *subjective* fear that these two candidates might, from the audience, disrupt the live telecast of the debates. And there is *objective* record evidence that CPD's fear of disruption, though likely overblown, was not imaginary. Shortly before the first debate in Boston in 2000, on national TV shows like *Meet the Press* [7] and *Larry King Live* [8] Nader decried his ineligibility to join debates with Al Gore and George W. Bush. Further, Nader's supporters held well-attended rallies and protests, chanting "Let Ralph Debate!" *See* A.R. 233–34, 241–49 (print media coverage of pro-Nader protests). CPD officials indicated that Nader's public statements, along with his supporters's actions, scared them into excluding Nader from the debates, fearing that he might try to make a statement from the audience.[9]

CPD also may have had reason to exclude Pat Buchanan out of a genuine concern that he would disrupt the 2000 debates from the audience. Buchanan, the 2000 Reform Party candidate, complained on national television, of his exclusion from the debates under CPD's eligibility rules. He used strong rhetoric to condemn his non-participation,[10] though he never hint-

6. Actually, the FEC General Counsel's opinion did not mention Buchanan. A.R. 382–89.

7. A.R. 236 (NBC, MEET THE PRESS Trans., Oct. 1, 2000):

> Mr. Russert: Mr. Nader .... You will not be there Tuesday night in Boston [at the first 2000 Presidential Debate at the University of Massachusetts]. If you—
> Mr. Nader: Yes, I will.
> Mr. Russert: On the stage. On the stage. On the stage.
> Mr. Nader: Maybe I'll crawl up on the stage there.
> Mr. Buchanan: Are you going to invade their space, Ralph?

8. A.R. 239 (CNN, LARRY KING LIVE Trans., Oct. 2, 2000):

> King: ... As I understand it, are you going to be in Boston tomorrow night? Are you going to be protesting the debates?
> Nader: We're going to try to get as close as possible. We're looking for people to give us tickets so I can be right in the audience.
> King: Oh, you want to be in the audience.

> Nader: Yes, I can't be on stage. We're excluded. It's a two-party monopoly.

9. *See, e.g.,* A.R. 25 (Loss Dep. at 50) (citing "concrete" fear that Nader might disrupt debates if allowed to sit in audience); A.R. 32 (Fahrenkopf Dep. at 44):

> [I]t was my own view and I came to be convinced that this way that, gees, this guy has been saying these things on national television and cameras. He sort of laid down a marker. I don't think Ralph would run up to the stage ... but he would very well stand up in the audience, stand up on a chair and say, oh, I could be on that stage, why won't you let me on that stage. That's what I was concerned about. And I felt that that would be very disruptive.

10. *See* A.R. 209 (Pat Buchanan, NBC MEET THE PRESS Trans., Oct. 31, 1999):

> [I]f somehow the two parties—and let's say I had 15 percent—... managed to keep me out of that debate, I would go to the American people and say, "I told you this was a fraud. I told you this system is fixed. I told you we got a duopoly, which hands the presidency back and forth and doesn't want

ed, or even joked, that he would climb on stage to crash the debates.[11] Still, CPD officials mentioned Buchanan and Nader in the same breath as potential disruptions at the 2000 debates.[12]

However, the CPD did not only exclude Nader and Buchanan from the 2000 debates. The facebook, used to exclude people from the debate halls, apparently included every third-party candidate running for president or vice-president in 2000 that CPD officials could remember.[13] Entirely missing from the record, *see generally* A.R. 1–391, as well as the FEC's dismissal, *see generally* A.R. 382–89, is any evidence that CPD subjectively feared that these other third-party candidates would disrupt

the 2000 debates or that these other candidates posed a more objective threat of disruption (e.g., by making public statements to that effect).

Indeed, the record indicates that CPD did not believe any other candidate, aside from Nader or Buchanan, was likely to disrupt the debates. CPD officials admitted repeatedly [14] that their policy explicitly excluded *all* third party candidates even though they only feared disruptions by Nader and, to a lesser extent, Buchanan:

> I want to be clear, *we made a decision that was of general application to third-party candidates*, but it really is the case that our focus was very much on the very concrete threat that we per-

anyone outside to even have a reach at it...." And I think there'll be such a firestorm that the two main parties will be risking losing all. So I would fight through to the end. It would be better, I believe, if I'm in the debate, but if they conspire to keep me out, I think they'll be pulling a razor across their throats.

**11.** *See* A.R. 203–11 (Pat Buchanan, NBC MEET THE PRESS Trans., Oct. 31, 1999). Indeed, Buchanan seemed either shocked or amused when Nader said he would "crawl up on the stage" at the first presidential debate in 2000. A.R. 236 (NBC, MEET THE PRESS Trans., Oct. 1, 2000).

**12.** *See* A.R. 25 (Loss Dep. at 100) ("Mr. Buchanan had been second only to Mr. Nader in terms of being very vocal about his view that the debates be sponsored by [CPD] were not legitimate in his view if he was included. I don't recall as I sit here today any specific statements he made ...."); A.R. 32 (Fahrenkopf Dep. at 44) ("It was a question of what happens if Ralph Nader and/or Pat Buchanan show up with a ticket into the hall, what we will do?").

**13.** *See* A.R. 20–22 (CPD Facebook) (including pictures for Green Party Vice–Presidential Candidate Winona LaDuke, Reform Party Vice–Presidential Candidate Esola Foster, Constitution Party Presidential Candidate Howard Phillips, Natural Law Party Presiden-

tial Candidate John Hagelin, Natural Law Party Vice–Presidential Candidate Nat Goldhaber, and Former Reform Party Vice–Presidential Candidate Russ Verney, and including name of, but not picture for, Constitution Party Vice–Presidential Candidate J. Curtis Frazier).

**14.** *See* A.R. 27 (Loss Dep. at 101) ("Q: Were you aware of any specific information leading you to conclude that any of the other third-party candidates posed a risk of disrupting ... if they were to gain access with a ticket? ... A: ... [W]e did not have—as I sit here now, I don't recall specific additional information of the type I reviewed concerned Ralph Nader."); A.R. 31 (Fahrenkopf Dep. at 26) ("The position was the third-party candidates would not be allowed to be present at the debate hall.... Any third party candidate, although to be candid with you, we only discussed really two—Mr. Nader and Mr. Buchanan."); A.R. 32 (Fahrenkopf Dep. at 42) ("We had heard Pat [Buchanan] was in town. We said, look, if Ralph does it, you know, Pat—we didn't know what was going to happen. Harry Brown and the other candidates—I mean, we didn't talk about it in the context of third-party candidates."); A.R. 32 (Fahrenkopf Dep. at 43) ("[W]e didn't say, Shall we exclude all third-party candidates. It was a question of what happens if Ralph Nader and/or Pat Buchanan show up with a ticket into the hall, what we will do? That

ceived Mr. Nader posed and what we understood was the very high likelihood that he was actually going to show up with a ticket .... We weren't aware of any other concrete threat.

A.R. 25 (Loss Dep. at 50) (emphasis added).

Further evidence shows that CPD's policy was not motivated by fear of disruption by the other third party candidates. CPD officials admitted that they never took measures to exclude non-candidates from disrupting the debates, even though objective evidence suggested that third-party supporters might be as likely to disrupt the debates as candidates themselves. News reports suggested that Nader's supporters in particular, having already broken into CPD headquarters and rowdily protested Nader's non-participation in the debates, posed a threat to disrupt the debates from the audience.[15] Nevertheless, CPD officials never considered or discussed the possibility that Nader supporters, for instance, might disrupt the debates, and CPD did not adopt a policy to

was the decision we reached. It didn't go any farther than that.").

15. See A.R. 241–42 (Manny Fernandez & David Montgomery, *Debate Protest Leads to Arrests; Nader Supporters Block Entrance to Commission's Building*, Wash. Post, Sept. 29, 2000 at A04); A.R. 244–47 (Boston.com Staff, *Thousands stage rowdy protest outside UMass–Boston entrance*, BOSTON.COM, Oct. 3, 2000).

16. See A.R. 27 (Loss Dep. at 101–02); A.R. 25–26 (Loss Dep. at 55–56):
Q: [D]id you discuss what would happen if anyone else other than a third-party president candidate appeared ... with a ticket that had been given to them ....?
A: No.
Q: Was there any plan to intercept any other people who had been given tickets second or third hand, if you will?
A: Not that I recall.

17. A.R. 26 (Loss Dep. at 57–58):

prevent such disruptions.[16] Indeed, in excluding only third-party candidates, CPD officials needed a facebook to identify the candidates because there was no other way to exclude persons from the debate halls.[17]

When these parts of the record are considered, the exclusion policy appears partisan on its face. The sole criteria CPD used to exclude people from the debates halls in 2000, even if they had tickets, was their status as third party presidential or vice presidential candidates, *see* A.R. 20–22, not their individual potential to disrupt the debates. Nevertheless, the FEC's dismissal suggests that the key issue is whether CPD provided "a sufficient basis to conclude the decision [to exclude third party candidates] may have been animated by partisanship," and not whether CPD's "fears of disruption were well-founded." A.R. 388. In its briefs, the FEC contends that its conclusions in MUR 5378 are based on inferences drawn from the factual record.[18]

■ However, the record shows that the CPD did not fear disruption from most

A: [I]t occurred to me that if a decision was made that required the identification of [third party candidates], it might be useful to have pictures of at least the ones that I could locate relatively readily. So I had this [the face book at A.R. 20–22].
Q: That was because there was no check in where you would match somebody's name up if they came in with a ticket to go to the Clark auditorium; is that right?
A: I don't think I actually went through that thought process.

18. The FEC insists that in MUR 5378, it merely "reached a different conclusion than plaintiffs did about what this evidence shows about CPD's motivations" and that its dismissal was "based upon inferences reasonably drawn from the evidence before it." Def.'s Reply at 5–6. Specifically, the FEC contends that whether the exclusion of third party candidates "was motivated by partisanship or by concerns over disruptions of the debates' live broadcast are inferences to be drawn from those facts ...." *Id.* at 6.

people it excluded from the debates. CPD officials admitted that they *subjectively* did not fear disruption by the third party candidates other than Nader or Buchanan, and there is no *objective* evidence that other third party candidates posed any risk of disruption. Only by ignoring this evidence was the FEC able to dismiss plaintiffs' complaint by concluding that CPD's exclusion policy was motivated by fear of disruption. *See* A.R. 388–89. The FEC may not ignore facts in the record or make inferences based on just certain facts.[19] Failure to consider relevant record evidence is arbitrary, capricious, and contrary to law. *Antosh,* 599 F.Supp. at 855 (holding that FEC's dismissal based on "misrepresentation of the facts" was contrary to law under FECA); *In re Fed. Election Campaign Act Litig.,* 474 F.Supp. 1044, 1046 (D.D.C.1979) (finding that the FEC "must take into consideration all available information concerning the alleged wrongdoing"). As a result, the court grants plaintiffs' motion for summary judgment and denies FEC's summary judgment motion on this issue—the FEC's dismissal of plaintiffs' administrative complaint was contrary to law, and the "no reason to believe" finding is reversed.

## C. Remand

■ Plaintiffs seek an order that would require the FEC to proceed directly to a probable cause determination within 30 days of its decision. Such an order would be improper. As the FEC correctly maintains, the court may not order the FEC to proceed directly to a probable cause determination. It must instead remand the case and allow the FEC to follow statutorily mandated procedures.

■ In general, when a court has found that an agency has acted contrary to law, the proper remedy is to remand the case to that body for further proceedings consistent with the court's opinion. *See, e.g., Vermont Yankee Nuclear Power Corp. v. NRDC,* 435 U.S. 519, 549, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978); *Fed. Power Comm'n v. Idaho Power Co.,* 344 U.S. 17, 20, 73 S.Ct. 85, 97 L.Ed. 15 (1952) ("[T]he function of the reviewing court ends when an error of law is laid bare. At that point the matter once more goes to the Commission for reconsideration."); *City of Cleveland, Ohio v. FPC,* 525 F.2d 845, 856 n. 89 (D.C.Cir.1976). This is also true in FEC cases. *See Antosh,* 599 F.Supp. at 856–57 (remanding case for further proceedings after finding FEC decision arbitrary and capricious).

■ Plaintiffs, however, cite the provision of FECA that gives the court the power to "declare that the dismissal of the complaint or the failure to act is contrary to law, and may direct the Commission to conform with such declaration within 30 days ...." 2 U.S.C. § 437g(a)(8)(C). Plaintiffs argue that this statute gives the court power to order the FEC to proceed to a probable cause determination within 30 days. This provision, however vague, simply indicates that the FEC must con-

19. That is, the FEC may not insulate its administrative decisions by making *post hoc* assertions that it considered the entire record and that, therefore, its findings must have been based on inferences drawn from the facts. Def.'s Reply at 5–6. The court will not presume that the FEC has reviewed the entire record. The proof is in the pudding only. The FEC's written opinion never mentions, directly or indirectly, the record evidence that CPD did not fear disruption by third party candidates aside from Nader or Buchanan. *See generally* A.R. 382–90. Further, an inference that CPD's policy "was based on concern of potential disruption during live television broadcasts, not partisanship," A.R. 388, could not be based on the *entire* record, for such inference ignores the fact that CPD's only concern was disruption by Nader and Buchanan.

form with the court's order, however formulated, within 30 days. See *Common Cause v. FEC*, 729 F.Supp. 148, 153 (D.D.C.1990) (ordering, pursuant to § 437g(a)(8)(C), the FEC to comply with the court's reversal of the FEC's "no probable cause" finding). Nothing in § 437g(a)(8)(C) allows the court to make the FEC disregard procedures mandated by FECA. Indeed, other FECA provisions clearly require the FEC to follow the statutorily-required process in dealing with administrative complaints. See 2 U.S.C. § 437g(a)(2); *id.* § 437g(a)(6)(A); *Perot*, 97 F.3d at 559 ("Section 437g is as specific a mandate as one can imagine; as such, the procedures it sets forth ... must be followed before a court may intervene."). Further, plaintiffs mis-cite authority by arguing that "a court has previously ordered the FEC to find probable cause," even though in that case, the FEC had already made a probable cause determination.[20]

Before proceeding to a probable cause vote, see 11 C.F.R. § 111.17, the FEC must complete all of the following steps: (1) issue legal and factual findings in support of the FEC's "reason to believe" decision, in accord with this court's opinion and order, 11 C.F.R § 111.9(a); (2) conduct an investigation, *id.* § 111.10(a); (3) have the FEC General Counsel issue a report, based on the investigation, that analyzes factual and legal issues in recommending whether to find probable cause, *id.* § 111.16(a); (4) give plaintiffs and CPD fifteen days to file briefs on the probable cause determination. *Id.* § 111.16(c).

The only sure way for the FEC to reach a probable cause determination in 30 days is to, as plaintiffs suggest, skip the investigation. See Pls.' Reply at 16 ("No further investigation is required for the General Counsel to prepare his brief or report ...."). However, an investigation must precede a probable cause determination. 11 C.F.R. § 111.17. Plaintiffs want the FEC to find probable cause that CPD is a partisan organization, in violation of 11 C.F.R. § 110.13, based on information it already has. Yet a thorough investigation of such an allegation, in a case not even past the "reason to believe" phase, *see Buchanan*, 112 F.Supp.2d at 73, may take more than 15 days. See, e.g., *Common Cause*, 729 F.Supp. at 150 (indicating that investigation after "reason to believe" finding took almost 9 months). Any delaying by the FEC in conducting an investigation pursuant to 11 C.F.R. § 111.10 is deplorable, but there is no apparent time limit to such an investigation. *Id.* The FEC must first conduct an investigation before voting on probable cause. See 2 U.S.C. § 437g(a)(2); *id.* § 437g(a)(4)(A)(i). These procedures provide "fairness not only to complainants but also to respondents." *Perot*, 97 F.3d at 559.

■ Plaintiffs, of course, argue that the "need for relief is urgent" because the first debate CPD will stage begins on September 30, 2004. Pls.' Mot. for Summ. J. at 3. However, even when a party requests urgent relief, laboring under the belief that the *Götterdämmerung* of representative democracy is at hand, the court cannot require immediate action by the FEC that

---

**20.** Pls.' Reply at 15 (citing *Common Cause*, 729 F.Supp. at 148). The court in *Common Cause* ordered the FEC to find probable cause only after the FEC already found "reason to believe" a violation had occurred, had conducted an investigation, received a FEC General Counsel report recommending that the FEC find probable cause, but nevertheless voted 3–3 to reject a probable cause finding. 729 F.Supp. at 150–51. *Common Cause* does not suggest, as plaintiffs do, that the court may leapfrog FEC regulations by ordering the FEC to find probable cause before it has gone no farther than a "no reason to believe" finding and has had no opportunity to investigate pursuant to 11 C.F.R. § 111.10.

would force it to disregard FECA's procedures. *Perot,* 97 F.3d at 558 (indicating that, short of finding 2 U.S.C. § 437g unconstitutional, a court could not order the FEC to disobey its statutory commands). Indeed, even if the FEC does not fully review plaintiffs' case on remand until after the 2004 presidential debates or elections,[21] there is no other recourse because Congress required such exhaustion. *See id.* at 559 ("Congress . . . knew full well that complaints filed shortly before elections, or debates, might not be investigated and prosecuted until after the event. Congress could have chosen to allow judicial intervention in the face of such exigencies, but it did not do so."). Therefore, the court will not require, as plaintiffs request, the FEC to make a probable cause determination within 30 days. Instead, the court remands the case to the FEC for further proceedings consistent with this opinion. On this issue, the court grants the FEC's motion for summary judgment and denies plaintiffs' motion.

## CONCLUSION

For the foregoing reasons, the court concludes that plaintiffs' summary judgment motion must be granted in part and denied in part, and that the FEC's summary judgment motion must also be granted in part and denied in part. An appropriate order accompanies this opinion.

## ORDER

For the reasons set forth in the court's Memorandum Opinion docketed this same day, it is this 12th day of August, 2004, hereby

**ORDERED** that plaintiff's motion for summary judgment is **GRANTED** in part and **DENIED** in part; it is further

**ORDERED** that defendant's motion for summary judgment is **GRANTED** in part and **DENIED** in part; it is further

**ORDERED** and **ADJUDGED** that defendant's decision in MUR 5378 was contrary to law and is therefore **REVERSED**; and it is further

**ORDERED** that this matter is remanded to the Federal Election Commission for further proceedings consistent with the court's opinion.

---

21. However, as the FEC concedes, even if the FEC does not resolve plaintiffs' administrative complaint before the 2004 presidential debates or election, the case will not be moot and will be fully justiciable. Def.'s Reply in Support of Mot. to Re–Set Oral Arg. at 4–5.