# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued February 24, 2020       Decided June 12, 2020

No. 19-5117

LEVEL THE PLAYING FIELD, ET AL.,
APPELLANTS

v.

FEDERAL ELECTION COMMISSION,
APPELLEE

Appeal from the United States District Court
for the District of Columbia
(No. 1:15-cv-01397)

*Alexandra A.E. Shapiro* argued the cause for appellants. With her on the briefs were *Eric S. Olney* and *Jacob S. Wolf*.

*Haven G. Ward* argued the cause for appellee. With her on the brief were *Lisa J. Stevenson* and *Kevin Deeley*.

Before: PILLARD and KATSAS, *Circuit Judges*, and RANDOLPH, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* RANDOLPH.

RANDOLPH, *Senior Circuit Judge*: The Commission on Presidential Debates (the "CPD") is a private non-profit corporation. For more than thirty years, it has hosted televised debates among the leading candidates for President and Vice President of the United States. The CPD uses several factors to decide which candidates are eligible to participate in its debates. At the center of this controversy is the CPD's compliance with rules of the Federal Election Commission (the "Commission") for determining which candidates are, or will be, eligible to participate in the debates.

The Commission's regulations allow a non-profit organization to stage candidate debates in federal elections so long as the organization does not "endorse, support, or oppose political candidates or political parties." 11 C.F.R. § 110.13(a)(1). The debates must "include at least two candidates" and cannot be structured "to promote or advance one candidate over another." *Id.* at § 110.13(b). Staging organizations must use "pre-established objective criteria" to select eligible candidates, and for general election debates, cannot "use nomination by a particular political party as the sole objective criterion." *Id.* at § 110.13(c).

The plaintiffs in this case are Level the Playing Field, a non-profit corporation created to promote independent candidates for elected office; Peter Ackerman, a registered voter from the District of Columbia; the Green Party; and the Libertarian National Committee, Inc. They argue that the CPD routinely endorses and supports Republican and Democratic nominees at the expense of third-party candidates. They also contend that the CPD uses subjective and biased criteria for selecting debate participants.

Although the CPD is by definition involved in politics, it neither endorses nor opposes candidates for the Presidency. The

government does not fund the CPD, nor does any political party, political action committee, or candidate. It is governed by an independent Board of Directors.

To participate in a CPD-sponsored debate, there are three requirements. The candidate must be qualified under the Constitution to be President. The candidate must be on the ballot of enough states to have a mathematical chance of winning a majority vote in the Electoral College. And the candidate must have a level of support of at least 15% of the national electorate, as determined by five selected national public opinion polling organizations, using the average of those organizations' most recent publicly-reported results at the time of the determination.

Plaintiffs began their case with two administrative complaints. The first challenged the 15% polling criterion, which the CPD used to determine eligibility for participation in the debates preceding the 2012 Presidential election. The Commission decided 5-0 (with one recusal) that the CPD's criterion did not violate the Commission's debate rules. The second complaint asked the Commission to initiate a rulemaking to change its rules to prohibit debate sponsors from using public opinion polls as a criterion for eligibility. The Commission rejected this request by a vote of 4-2. Based on these votes, the Commission dismissed both administrative complaints.

Plaintiffs sought review in the district court, alleging that the dismissal of their complaints violated the Administrative Procedure Act. For reasons unnecessary to discuss, the district court remanded both administrative matters to the Commission for further consideration of the record. The Commission adhered to its original decision. On the return of the case to the district court, the court granted summary judgment in favor of the Commission. We agree with the district court's thorough

4

and well-reasoned decision and, applying *de novo* review, we affirm.

**I.**

Judicial review of decisions by the Federal Election Commission is highly deferential. *Hagelin v. FEC*, 411 F.3d 237, 242 (D.C. Cir. 2005). We presume the validity of the Commission's decisions and will reverse them only if they are contrary to law, not supported by substantial evidence, or are arbitrary, capricious, or an abuse of discretion. *Id*.

Plaintiffs urge us to apply a less deferential standard of review, arguing that the Commission's decisions display a "pattern of suspect decisionmaking," "bias," and a "partisan agenda." But as we have previously explained, the "arbitrary and capricious and substantial evidence standards" are "fully adequate to capture partisan or discriminatory FEC behavior." *Hagelin*, 411 F.3d at 243. Indeed, decisions featuring unjustifiable bias or partisanship are precisely the types of agency actions that "would work a violation of the arbitrary-and-capricious standard." *Id*. (citation, internal quotation marks and alteration omitted). Accordingly, we need not create a new standard of review to assess the appropriateness of the Commission's actions in this case.

**II.**

Plaintiffs believe that the CPD is an "overtly partisan" organization whose goal "is to exclude independent candidates." They argue that the Commission refused to recognize this bias, thereby ignoring the regulations that require debate sponsors not to endorse, support, or oppose political parties or their candidates.

As evidence of the CPD's purported partisanship, plaintiffs highlight various statements and campaign contributions made by the CPD's founders and leaders. For example, announcing the formation of the CPD in 1987, the Democratic and Republican National Committees "emphasiz[ed] the bipartisan nature" of the CPD and noted that the debates would be "party-sponsored." Frank Fahrenkopf, then chairman of the Republican National Committee and a current CPD co-chair, indicated that the CPD "was not likely to look with favor on including third-party candidates in the debates." Similarly, Paul Kirk, the chairman of the Democratic National Committee at the time and a former CPD co-chair, said he "personally believed that the [CPD] should exclude third-party candidates from the debates."

The Commission carefully considered these and other statements made when the CPD was created in 1987. It found the statements to have "limited persuasive value" for three reasons. First, the Commission reasoned that decades-old declarations are not particularly probative of current bias, as organizations can change. Second, the early statements about the CPD must be understood in the context of trying to institutionalize televised debates as a "permanent part of the political process." And third, statements made by individuals do not necessarily reflect an organization's endorsement or support. Each of these explanations was reasonable.

Take the first explanation. The record supports the Commission's view that the CPD has changed over time, making "concerted efforts to be independent in recent years." After third-party candidate Ross Perot's exclusion from the 1996 debates, for instance, the CPD "adopted new candidate selection criteria and retained a polling consultant to ensure" "careful and thoughtful application" of the new criteria. The Commission also noted that the CPD "conducts a review after every presidential election of issues relating to the debates." In light

of these changes and ongoing reviews, it was reasonable for the Commission to believe that statements made about the CPD in 1987 do not adequately describe the CPD as it exists today. *See Hagelin*, 411 F.3d at 244.

It was also reasonable for the Commission to place the early statements made by Fahrenkopf and others in context. For instance, the Commission credited a sworn declaration from Fahrenkopf explaining that when the CPD was first created, "the major impediment to" institutionalizing televised debates "was securing the commitment of both major party nominees to debate." Thus, references to a "bipartisan" and "party-sponsored" organization were meant to convey only that the CPD would not favor one leading political party at the expense of the other. American politics has, for most of American history, been organized around two parties. *See Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 367 (1997). So it is plausible that leaders of the newly-created CPD used terms like "bipartisan" and "party-sponsored" to assure and secure support from both major parties.

The Commission explained that "even if these written and oral statements did reflect more current sentiments, they are not indicative of CPD's *organizational* endorsement of or support for the Democratic and Republican Parties and their candidates. ..." The record supports this finding. The 1987 statement announcing the formation of the CPD, for instance, was released by the Democratic and Republican National Committees, and not by the CPD. Paul Kirk's statement that the CPD should exclude third-party candidates was based on his personal view, and he added that "he could not speak for the [C]ommission."

Plaintiffs characterize the Commission's explanations as "spurious" and attack the affidavits submitted by Fahrenkopf

and others as "boilerplate" and "meaningless." But as the district court explained, that plaintiffs may disagree with the Commission's weighing of the evidence presented to it is not enough for the courts to overturn the Commission's decisions as arbitrary, capricious, or contrary to law. *See Level the Playing Field v. FEC*, 381 F. Supp. 3d 78, 101 (D.D.C. 2019). The Commission considered plaintiffs' submissions and articulated reasonable explanations for assigning the decades-old statements little probative value.

Plaintiffs also presented the Commission with contemporaneous evidence of the CPD's alleged bias. In 2015, for example, Fahrenkopf was interviewed by Sky News. During the interview he said that the CPD "primarily go[es] with the two leading candidates" from the "two political part[ies]." In 2011, Fahrenkopf wrote an op-ed in which he praised the Republican Party and described it as "our great party." And since 1997, Fahrenkopf has donated tens of thousands of dollars to Republican congressional and presidential candidates.

Michael McCurry is also a co-chair of the CPD. He previously served as President Bill Clinton's press secretary and as a director of communications for the Democratic National Committee. Since 2008, McCurry has given tens of thousands of dollars to Democrats. Plaintiffs claim that the statements and contributions made by Fahrenkopf and McCurry are illustrative of the CPD's partisan bias.

The Commission rejected this argument, again providing reasonable explanations supported by the record. For example, the Commission noted that during the 2015 Sky News interview, Fahrenkopf was asked "about the impact of multiple candidates (the questioner posited seven) on the educational value of debates." Fahrenkopf responded by lamenting the quality of primary debates, which can feature "seven or eight people on the

stage," and which "people jokingly say" are "less of a debate than a cattle show."  He then said: "That's why in the general election debate, we have a system, and we . . . primarily go with the two leading candidates, it's between the two political party candidates . . . except for 1992 when Ross Perot participated in the debates."  The context of the interview thus makes clear that Fahrenkopf was expressing a preference for smaller debates where the candidates with the most support are given more time to share their views with voters.  He was not, as plaintiffs suggest, admitting that the CPD seeks to exclude independent candidates to benefit Democratic and Republican candidates.  Considering Fahrenkopf's words in the appropriate context, the Commission justifiably concluded that plaintiffs' "interpretation is not dispositive."

With respect to Farenkopf's 2011 op-ed and the donations he and others have made to candidates from the two major political parties, the Commission stated that "individuals may wear multiple hats to represent multiple interests."  And if this is permissible, the Commission reasoned, it follows that "an individual's leadership role in a given organization does not restrict his or her ability to speak freely on political issues or make contributions to political committees when he or she does so in his or her personal capacity."

Reviewing the record, the Commission found no evidence that Farenkopf's 2011 op-ed was written in his official capacity as a CPD co-chair or was intended in any way to represent the views of the organization.  Similarly, plaintiffs cannot identify a single instance of a donation to a Democrat or Republican that was made by the CPD or one of its leaders acting in his or her official capacity.

Plaintiffs' arguments, then, amount to a disagreement with the Commission's view that personal partisan activities do not

necessarily reflect the views or biases of the organization for which a person works.  But again, as the district court held, "such a disagreement does not discharge [p]laintiffs of their burden to establish that the [Commission's view] was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 381 F. Supp. 3d at 105.  Plaintiffs have not met that burden.  The Commission has consistently maintained that individuals may support political candidates when acting in their personal capacities, even if they would be prohibited from doing so in their professional capacities. *See, e.g.* FEC Advisory Op. 2007-05; Advisory Op. 2005-02; Advisory Op. 2003-10.  And this position is well-founded.  It is axiomatic that, for an agent's statement to be attributable to the principal, the "speaking must be done in the capacity of agent and connected with the business of the principal."  Restatement (First) of Agency § 288 cmt. b (Am. Law Inst. 1933).

In sum, far from ignoring plaintiffs' evidence, the Commission thoughtfully evaluated the record.  The Commission offered detailed explanations in support of its view that plaintiffs failed to show impermissible bias against independent candidates or in favor of candidates from the two major political parties.  And though plaintiffs may disagree with these explanations, they have failed to show that the Commission's decisionmaking was arbitrary or unreasonable.

## III.

Plaintiffs also contend that the CPD's use of a 15% polling requirement to select debate candidates is "subjective" and favors major-party candidates. This threshold, they argue, violates 11 C.F.R. § 110.13(c), which requires staging organizations to "use pre-established objective criteria to

determine which candidates may participate in a debate." In support of this claim, plaintiffs presented the Commission with two expert reports. The first, written by Dr. Clifford Young, posits that "on average, an independent candidate must achieve a minimum of 60% name recognition, and likely 80%, in order to obtain 15% vote share." The second, prepared by Douglas Schoen, suggests that an independent candidate "should reasonably expect to spend approximately $266,059,803 to run a viable campaign capable of reaching 15% support in polls by September of the election year."

Plaintiffs argue that these studies show the 15% threshold is not objective because, while major party candidates "benefit from the widespread media coverage of the presidential primaries," independent candidates "have no analogous mechanism for generating name recognition." And if an independent candidate must spend over $260 million to achieve 15% support, plaintiffs reason, "[o]nly a self-funded billionaire could realistically hope to compete as an independent."

The Commission considered and rejected these arguments. Evaluating the expert reports, the Commission found several "limitations that undermine their persuasiveness." The Young Report, for instance, "correlates polling results to name recognition alone," but as Dr. Young himself acknowledged, several other factors affect a candidate's poll numbers, including "fundraising, candidate positioning, election results, and idiosyncratic events." The Commission also noted that "neither the Young Report nor [plaintiffs] . . . ever establish that independent candidates do not or cannot meet 60-80 percent name recognition." The Commission cited as a counter-example a 2016 YouGov poll, which found that 63% of registered voters had heard of Libertarian candidate Gary Johnson, while 59% had heard of Green Party candidate Jill Stein.

These critiques of the Young Report are reasonable. The omission of relevant variables from a statistical analysis "may render the analysis less probative than it otherwise might be." *Bazemore v. Friday*, 478 U.S. 385, 400 (1986) (per curiam) (Brennan, J., concurring). It is quite plausible that a factor like the unpopularity of major-party candidates could lead to a high degree of support for an independent candidate who has less than 60% name recognition. And the Commission reasonably relied on a YouGov poll to question the notion that independent candidates cannot achieve 60% name recognition. Though the Young Report posited 60% name recognition was necessary among the American public and the poll only shows name recognition among registered voters, the poll still suggests independent candidates may sometimes earn significant name recognition. *See also Buchanan v. FEC*, 112 F. Supp. 2d 58, 74 (D.D.C. 2000) (listing George Wallace, John Anderson, and Ross Perot as examples of independent candidates who achieved at least 15% support in pre-election polling).

The Commission identified many reasons to discount the findings of the Schoen Report, too. For example, the Commission found that the $260 million estimate rests "on the assumption that independent candidates are unable to attract earned media (*i.e.*, free coverage)." The Schoen Report also fails to account for the role of social media, which the Commission notes has "enabled the ubiquitous sharing of [candidates'] messages among vast global networks."

Again, these critiques are reasonable and well-supported. As the Commission highlights, Libertarian candidate Gary Johnson received extensive media coverage during the 2016 presidential election. And at least some of that coverage was not generated by the campaign's spending. *See, e.g.*, Jonah Bromwich, 'I Guess I'm Having an Aleppo Moment': Gary

Johnson Can't Name a Single Foreign Leader, N.Y. Times, Sep. 28, 2016, available at https://www.nytimes.com/2016/09/29/us/politics/gary-johnson-aleppo-moment.html. The Commission similarly cited the example of the 2016 Trump campaign, during which "digital media reportedly replaced field offices," "thereby reducing another traditional campaign cost."

More broadly, we need not conclusively determine the validity or persuasiveness of the Young and Schoen reports to decide this case. Even if both reports are correct, and it takes a large amount of money and name recognition for a candidate to be viable, the 15% polling criterion is not impermissible.

All that is required is that the CPD use a "pre-established objective criteria" to determine debate eligibility. 11 C.F.R. § 110.13(c). Plaintiffs have identified many reasons why it might be difficult for an independent candidate to achieve the support of 15% of the electorate. But a threshold does not become "subjective" merely because it is difficult to reach. There is no legal requirement that the Commission make it easier for independent candidates to run for President of the United States. The Commission thus acted reasonably in determining that a 15% polling threshold is an objective requirement.

**IV.**

In addition to challenging the CPD's existing criteria, plaintiffs asked the Commission to initiate a rulemaking to revise and amend 11 C.F.R. § 110.13(c). Specifically, they believe the Commission's rules should preclude debate sponsors from using any polling threshold and should instead require the CPD to select some other unspecified "objective, unbiased criteria for debate admission."

The Commission rejected the request to change its regulations. Our review of a rulemaking denial is "extremely limited and highly deferential." *Massachusetts v. EPA*, 549 U.S. 497, 527-28 (2007) (internal quotation marks and citation omitted). Federal agencies have "broad discretion to choose how best to marshal [their] limited resources and personnel to carry out [their] delegated responsibilities." *Id*. at 527.

Applying this even more deferential standard, we affirm the Commission's decision. Plaintiffs suggest that the Commission's rejection of their petition was arbitrary and capricious "for the same reasons" they challenge the Commission's decisions about the CPD's neutrality and the 15% polling criterion. Because we have found that the Commission acted reasonably in reaching those decisions, we hold that the Commission did not err by electing not to initiate a rulemaking.

For these reasons, the district court's grant of summary judgment to the Commission is affirmed.

*So ordered.*